## Case No. 7,507.

### JONES v. WALKER.

[2 Paine, 688.] [1]

Circuit Court, Virginia. [2]

[1] [Reported by Elijah Paine, Jr., Esq.]
[2] [District and date not given.]

JAY, Circuit Justice. This is certainly a cause of great magnitude and expectation; all causes which affect many persons and much property, are so. It has been ingeniously and industriously managed, and it has been attentively and patiently heard. The action is for the recovery of money due on bond prior to the war. The first plea is payment, and on that the parties are at issue. The other pleas have terminated in demurrers, and the court is thereby called upon to decide on their legal efficiency.

The first which I shall consider is the last on the record. It. produces this question: Was the debt annulled by the dissolution of the government which existed when the debt was contracted? This plea, that the debt was annulled when the then existing government of this country was dissolved, appears to me to be unsupported by any principle recognized by the laws of nature or nations. It is not pretended that the debt was not contracted bona fide, or that the parties, or either of them, were under legal disabilities. The creditor, by the contract, then acquired a perfect right to demand, and a perfect obligation was at the same time imposed on the debtor to pay. By the dissolution of the government, the creditor necessarily lost the judicial means of compelling payment in this country, but the mere dissolution of the government could not destroy his right to compel it whenever and wherever he should find such means. If the debt did on that event become annulled, not only the creditor lost his right to demand, but the debtor must, consequently, have ceased to remain under any obligation to pay. We find, however, that the pleas speak a different language, and that the acts of Virginia, specified in those pleas, considered those debts as still existing, and as proper objects of legislative regard and provision. If the debt was annulled and annihilated, why enable the debtor to pay into the loan-office sums which, according to this doctrine, he was under no obligation to pay at all? Why give him a formal receipt to discharge him from so much of the debt as he should pay, when, by the prior dissolution of the government, he had been discharged from the whole of it? The subject affords room for more extensive investigation; and it would not be difficult to show that these rights do not originate in human institution, although human institutions may enforce or suspend their operation, or in certain cases declare them forfeited.

The plea which it appears to me proper next to consider is, that the king of Great Britain, by reason of the facts specified in it, is an enemy of the United States, and, therefore, that the plaintiff, who is his subject, ought not to have or maintain his action aforesaid. The question arising on this plea, is whether (admitting the facts plead to be true) the king of Great Britain hath become the enemy of the United States, in that sense which would justify the court in considering his subjects as being alien enemies, and, consequently, incapable of maintaining actions in our courts. There is a wide distinction between a power who is unfriendly and inimical to, and a power actually at war with the United States. and they with him. There is, also, a wide distinction between the existence of causes which would justify a war, and the existence of actual war in consequence of them. Whatever causes or reasons there may be to justify war, yet these causes and reasons must remain and be considered as mere inducements, until the power vested with the right to make war shall think proper, by declaration or deeds, to cause a state of war to exist. It is the duty of the court to know that peace between Great Britain and the United States has been concluded and published; that peace between them still exists; that the two nations regard each other in that light, and that the president's late proclamation banishes every doubt on the subject. The defendant having plead in bar, that pursuant to an act passed by Virginia during the war, he had paid the debt into the loan-office of that state, and that the debt had thereby been discharged; the plaintiff replies the fourth article of the treaty of peace, which stipulates that "creditors on either side shall meet with no lawful impediments to the recovery of all bona fide debts theretofore contracted." To this the defendant rejoins that the king of Great Britain had, in the instances there specified, violated the treaty, and further, that the said debt having been discharged in pursuance of a pre-existing act of Virginia. was not one of those bona fide debts mentioned in the fourth article. To this rejoinder the plaintiff demurs.

The first question which these pleadings naturally suggest is, whether this court has authority to take cognizance of infractions of the treaty by Great Britain, and by reason of them to declare the treaty to be void as to the United States. It is strenuously insisted that the court has such authority: (1) Because, on the distribution of the sovereignty into the three departments of executive, legislative and judicial, such authority became incident to the latter; (2) because. treaties being laws of the land, they fall within the jurisdiction and cognizance of the judiciary; (3) because the authority in question is given by the constitution, and is recognized to have been so given by the judicial act of congress.

I begin with the last, for as the power of the judiciary might have been extended, or limited, according to the pleasure of those who, by the constitution, established it, it is proper to inquire whether the constitution does extend that power to the case now before us in the sense now contended for.

If it does, it ought to be exercised; if not, it ought not to be assumed. The constitution expressly declares that the judicial power shall extend to all cases in law and equity arising under treaties. It also declares that treaties shall be the supreme law of the land.

The twenty-sixth section of the judicial act [1 Stat. 87] recognizes its power to determine cases where is drawn into question the validity of treaties. Perhaps it may tend to elucidate the subject if we were to consider "validity," applied to treaties, as admitting of two descriptions, viz., "necessary" and "voluntary." By "necessary validity," I mean that which results from the treaty's having been made by persons authorized by, and for purposes consistent with the constitution. To this kind of validity all such questions as these relate, viz.: Has the treaty been made and ratified by the president, by the advice and consent of three-fourths of the senators present? Is it temporary, and has it expired? Is it perpetual? Has it been dissolved with mutual agreement? Has it been annulled and declared to be void by the nation, or by those to whom the nation has committed that power? Does it contain articles repugnant to the constitution? Are those articles void? Do they vitiate the whole treaty? &c., &c. By "voluntary validity," I mean that validity which a treaty, become voidable by reason of violations, afterwards continues to retain by the silent volition and acquiescence of the nation. I call it "voluntary," because it entirely depends on the will of the nation, either to let it continue to operate, or to annul and extinguish it. To this head such questions as these relate, viz.: Has the treaty been so violated as justly to become voidable by the injured nation? Is it advisable immediately to declare it void? Would such a measure probably produce a war? Would it be more prudent first to remonstrate and demand reparation, or to direct reprisals? Are we in condition for war? Ought we at this juncture to risk it, or shall we postpone that risk until we can be better prepared for it? Shall we at this moment take any measures, or would it be more prudent to remain silent for the present, and let the treaty go on and continue to operate as if nothing had happened? &c., &c., &c. On comparing the principles which govern and decide the necessary validity of a treaty, with those on which its voluntary validity depends, we cannot but perceive that the former are of a judicial, and that the latter are of a political nature. That diversity naturally leads to an opinion that the former are referable to the judiciary. and the latter to those departments which are charged with the political interests of the state. If the order and proper disposition of the thing strongly indicates this distribution, there is great reason to presume it was intended by the constitution and the judicial act; and,

therefore, that the power given the judiciary to decide on the validity of treaties, was, by the nature of the subject, restricted to their necessary validity; necessary, because while performed by one party it rests not on the volition of the other, but on that perfect obligation which contracts authorize and not improperly impose on both the parties.

The history of nations, even the most free, and whose governments were the most popular, affords no examples of their having committed the voluntary validity of treaties to the decision of courts of justice; and thence there is reason to argue, that if an idea so new and singular had been adopted by the convention, they would have pointedly and particularly expressed it in the constitution, and not have left it to be inferred from any enlarged sense in which the word "validity" was capable of being understood; especially as it was natural to apprehend that the tribunals of the United States, like the tribunals of all other countries, would understand it only to mean the necessary validity of treaties. When it is considered that the voluntary validity of treaties (except so far as may concern their voidability) is to be decided not by fixed and immutable rules and principles, but entirely by prudential considerations, the inexpediency of committing its decision to two concurrent jurisdictions, that is, to the judiciary and to congress, (it being necessarily incident to the right of making war,) and that, too, without appeal to any third body, is very apparent; for, in cases of disagreement in opinion, the same treaty might be annulled by the one against the opinion and judgment of the other, and the people would be at a loss to determine how to act, or which opinion ought to prevail. That two such concurrent and probably clashing jurisdictions would unavoidably introduce many inconveniences, is obvious; but it is not easy to discern in what respect they would be useful. In short, it is not, in my opinion, to be presumed that a power so pregnant with discord, political contradiction and national inconsistency, could have been within the intention and meaning of the convention, when, by the constitution, they extended the power of the judiciary to all cases arising under treaties.

2. That treaties being laws of the land, fall within the jurisdiction and cognizance of the judiciary. Whatever distinction there may be between a treaty considered as a great national contract, and a treaty considered as a law of the land, yet it will not warrant the conclusion that as a treaty its voluntary validity may be exclusively determinable by congress, but that as a law of the land, the judiciary are to decide whether it be in force. Every law derives its obligation from the will of those who had authority to enact it. Every treaty derives its obligation from the will of those who had authority to conclude it. Neither of them can be repealed

or annulled but by the will of those who have authority to repeal or annul them. It has been shown that the judiciary are not authorized to annul a treaty; and it will not be contended that they are authorized to repeal a law. So that, whether a certain instrument be called a treaty or a law, it belongs not to the judiciary to abrogate it. Indeed, the objection is doubled to those who consider it as having a twofold capacity of being both a treaty and a law.

From this topic another argument, more specious and also more intricate, is drawn; it is this: That every engagement in a treaty between sovereigns, which gives reciprocal rights to and imposes reciprocal obligations on their respective subjects and citizens relative to each other, becomes, in virtue of the treaty's being a law of the land, an engagement or contract between them, and that such contracts, standing essentially on the same footing with other contracts between individuals, must be cognizable by the judiciary. That the mala fides (affecting the treaty) of one of the sovereigns is imputable to his subjects, and so becomes their mala fides. That the voidability of the treaty resulting to the injured sovereign from this mala fides, also descends to his citizens, and that they thence acquire a right to take advantage of that voidability in all actions brought against them on that contract by the other sovereign's subjects, and to plead their imputed mala fides in bar. That in cases so circumstanced, the courts are to try the merits of that plea, and to consider the matter in difference as a matter in difference arising on a contract between the parties. This argument appears to me to be not only ingenious, but also fallacious. The article or engagement in question is not a several contract between the supposed plaintiffs and defendants, but between two moral persons, of whom they, with every individual of their respective nations, are joint members, governed as relative to the treaty not by their several wills, but by the sole will of the moral person whose members they are; as in the natural body, whatever rights belong to the hand belong to the man, and every injury offered to the hand is offered to the man. In the case supposed, the mala fides of the plaintiff's sovereign necessarily becomes the gist of the action; for, until this mala fides be found to exist, it cannot be imputed, and until it be imputed, his right to action cannot be impeached, and, consequently, the defendant's plea cannot be supported. Hence, it follows, that in all such causes the first questions to be tried and decided by the court are, first, whether the plaintiff's sovereign has been guilty of the mala fides averred in the plea; and if he has, then, secondly, whether it be of such a nature and degree as to give to the injured sovereign a right to annul the treaty; for, until these questions are decided in the af-

firmative, the mala fides of one sovereign, and the rights resulting from it to the other, cannot descend and attach to their respective subjects and citizens even by fiction of law. A charge of mala fides is odious, and ought not to be judicially inquired into and decided in the absence of the party charged. Sovereign nations acknowledge no common tribunal on earth; their bona fides or their mala fides are questions not to be litigated in courts of justice. We are not warranted to say that only the mala fides of the plaintiff, and the consequent rights of the defendant, derived by imputation from their respective sovereigns, are in question; and, therefore, that the sovereigns remain foreigners both to the question and the decision. The fact is otherwise. The contracts of sovereigns or nations are made for the benefit of all the subjects or people; and, therefore, every sovereign or nation is interested in every act which necessarily limits, impairs or destroys that benefit. Can American citizens be divested of rights accruing to them by treaty, and the American sovereignty remain untouched? Whatever injuries result to subjects by imputing to them the acts of their sovereign, run back through the same channel from them to the sovereign. He is bound to protect them, and consider all injuries done to them by such imputation as done to himself; that is, as done to the whole nation. Every judgment, therefore, against a subject, grounded on such imputation, is a judgment mediately against the sovereign or moral person with whom the treaty was made, and which moral person is composed of all the people or nation collectively considered. It is true, as has been alleged, that the judicial acts of one nation are to be respected by another, and are conclusive on the subjects of the other, relative to all matters within the natural jurisdiction; but in order to render them conclusive, it is further necessary that they should be matters cognizable by the court and fairly decided.

3. That on the distribution of the sovereignty into the three departments, of executive, legislative and judicial, the authority in question became incidental to the latter. No right can be incident to one department which necessarily goes to the suspension of a right incident to another, or to control, suspend or defeat its operation. If this principle be just, it follows that, where the department authorized to annul a voidable treaty shall deem it most conducive to the national interest that it should longer continue to be obeyed and observed, no right can be incident to the judiciary to declare it void in a single instance. There is a tide in human affairs which statesmen are to watch and profit by for the good of the nation, but which they should never be compellable. by the interference of any tribunal, to stem. The obstacles interposed by the before-mentioned pleas being removed, the fourth article of the definitive treaty of

peace comes into view; and the great question which remains to be decided is. whether the defendant's pleas to bar the plaintiff from the benefit of it are sufficient? The first of these pleas is. that the debt was discharged by the plaintiff's having paid the amount of it into the loan-office of Virginia. pursuant to an act of that commonwealth, passed the 26th October, 1777, entitled "An act for sequestering British property, enabling those indebted to British subjects to pay off such debts, and directing the proceedings in suits where such subjects are parties;" whereby it is enacted, "that it shall and may be lawful for any citizen of this commonwealth owing money to a subject of Great Britain, to pay the same, or any part thereof, from time to time, as he shall think fit, into the said loan-office, taking thereout a certificate for the same in the name of the creditor, with an endorsement under the hand of the commissioners of the said office, expressing the name of the payer; and shall deliver such certificate to the governor and council, whose receipt shall discharge him from so much of the said debt." The plea then proceeds to aver such payment and receipt. The second of these pleas is grounded on another act of Virginia, passed the 3d May, 1793, entitled "An act concerning escheats and forfeitures from British subjects." The fourth section of this act contains the following words: "But this act shall not extend to debts due from British subjects and payable into the loan-office, according to the act of assembly for sequestering British property." This act, therefore, has no relation to the matter in controversy. and must have been inadvertently pleaded. The third of these pleas is grounded on an act of Virginia, passed the 6th of May, 1782, entitled "An act to repeal so much of a former act as suspends the issuing of executions upon certain judgments until December, 1783," whereby it is enacted. "that no demands whatsoever, originally due to a subject of Great Britain, shall be recoverable in any court of this commonwealth. although the same may be transferred to a citizen of this state. or to any other person capable of maintaining such action, unless the assignment hath been or may be made for a valuable consideration, bona fide paid before the first day of May, 1777." The defendant avers that these acts are unrepealed and in full force and virtue, and that the debt in the declaration mentioned is a demand originally due to a subject of Great Britain, and not transferred to any person whatsoever.

I shall first consider the third, or last of these pleas. It is a well-known principle that an alien enemy cannot maintain an action in our courts; and it is not easy to presume that the design of the act was to declare or ordain that to be law which was evidently and undeniably law before. It would be odious to presume that the design of the act was to prohibit and disqualify British subjects to bring and maintain actions in the courts of Virginia, even after peace should be restored,

and these subjects had ceased to be alien enemies. It would be odious, because such a prohibition and exclusion would have been contrary to the laws and practice of civilized nations, and would have been carrying the enmities of war into the bosom of peace. Neither of these constructions, therefore, is to be adopted in case one more consonant to reason and the usage of nations can be found. There is a very obvious one; it is this: In Virginia, assignees may bring actions in their own names. To prevent the payment of money to enemies during a war was just and expedient, and prudence directed that alien enemies should be prevented from recovering their debts by means of fraudulent assignments. It was wise, therefore, in Virginia, to provide that no debt due to an enemy should be recoverable, in virtue of an assignment from him to a citizen, unless the consideration had really been paid before the time specified in the act. If this construction of the act be just, then it follows that it left British subjects precisely under the same, and no other disabilities, than the laws of war and nations had already placed them—the object of the act being only to provide against the evils of fraudulent and collusive assignments. This is the only act pleaded which has any relation, either direct or consequential, to those British debts which have not been paid into the loan-office. It makes no alteration either in the rights of the creditor or the obligation of the debtor, and therefore, in my opinion, the creditor, on the return of peace, had good right to bring and maintain his action for the recovery of his debt, even if the fourth article of the treaty had been omitted. Before the war, the creditor had a perfect right to payment, and the debtor was under a perfect obligation to pay. The right of the one, and the obligation of the other, were suspended by the war and during the war; but when the war ceased, that suspension ceased with it. the peace replacing both the parties in their pristine situation relative to each other. Much time, learning and industry have been employed in endeavoring to prove that debts due to an enemy were res hostiles, and liable to confiscation. Many questions incident to that doctrine have been ably and eloquently discussed, and many authorities have been adduced and applied; and yet it does not appear, from any of the acts of Virginia that are pleaded, nor, to my knowledge, from any which are not pleaded, that Virginia ever did, either expressly or impliedly, confiscate a single British debt. I am constrained. therefore, to regard these discussions as having been foreign to the subject.

The only plea which remains to be considered is the one which respects those debts which have been paid into the loan-office, pursuant to the act of October, 1777. The whole force of this plea depends, in my opinion, on the operation which the receipt or discharge pleaded may be found entitled to. But it may be proper previously to inquire, whether

the right of the plaintiff. as well as the obligation of the defendant, is affected by the act? If the debt justly could be, and really was, confiscated by the act, there is no doubt but that the plaintiff's right became extinguished; but neither the word confiscate. nor any words tantamount to it as applied to debts, are to be found in it—nor is it a clear point that debts were even sequestered by the act. If they had been, the plaintiff's right to the money, unless barred by the subsequent treaty of peace, would have been perfect after the war.

Let us carefully examine this act. A preamble cannot annul enacting clauses; but when it evinces the intention of the legislature and the design of the act, it enables us, in cases of two constructions, to adopt the one most consonant to their intention and design. The preamble is in these words, viz.: "Whereas, divers persons, subjects of Great Britain, had, during our connection with that kingdom, acquired estates real and personal within this commonwealth, and had also become entitled to debts to a considerable amount, and some of them had commenced suits for the recovery of such debts before the present troubles had interrupted the administration of justice—which suits were, at that time, depending undetermined; and such estates being acquired, and debts incurred, under the sanction of the laws, and of the connection then subsisting—and it not being known that their sovereign hath as yet set the example of confiscating debts and estates under the like circumstances, the public faith and the law and usages of nations require that, they should not be confiscated on our part; but the safety of the United States demands, and the same law and usages of nations will justify, that we should not strengthen the hands of our enemies during the continuance of the present war, by remitting to them the profits or proceeds of such estates, or the interest or principal of such debts." From this preamble, it is plain and manifest, that the legislature were so far from entertaining or adopting the idea of confiscation, that they do, in express terms, reject it as being contrary to the public faith and to the law and usages of nations. Of sequestration, the preamble says nothing; but from the title, it would seem as if it were intended. It is in these words: "An act for sequestering British property, enabling those indebted to British subjects to pay off such debts. and directing the proceedings in suits where such subjects are parties." The words "sequestering British property" lead to an opinion that debts, being comprehended within the common acceptation of the word property, were intended to be sequestered; but this opinion is far from being confirmed by the enacting clauses. The first of them enacts: "That the lands, slaves, stocks and implements thereunto belonging. within this commonwealth, together with the crops now on hand, or hereafter to accrue, and all other estate of what-

ever nature, not herein otherwise provided for, of the property of any British subjects, shall be sequestered into the hands of commissioners." This is a complete and general sequestration of all British property not therein otherwise provided for. It seems, then, that there was some kind of British property respecting which the legislature deemed it proper to make other provision. Other than what? The obvious answer is—other than sequestration.

The next enacting clause informs us what that kind of property was which was to be otherwise provided for by the act. It enacts: "That it shall and may be lawful for any citizen of this commonwealth, owing money to a subject of Great Britain, to pay the same or any part thereof, from time to time, as he shall think fit, into the loan-office, taking thereout a certificate for the same in the name of the creditor, with an endorsement under the hand of the commissioner of the said office, expressing the name of the payer, and shall deliver such certificate to the governor and council, whose receipt shall discharge him from so much of the said debt." Thus we see that the legislature were pleased to separate British debts from that general sequestration in which they involved all other British property. There must have been some good reason for this discrimination. The act does not inform us what it was, but the nature of the subject points to the following: Had debts been sequestered, it would have been necessary to make it the duty of debtors to pay, and to have appointed and authorized commissioners to demand and collect them. Such a measure in the then situation of public affairs, would not have been advisable; it would have alarmed the debtors, whose numbers were not inconsiderable, and it would have been particularly disgusting to those among them who might not find it convenient to pay, or who might then have imbibed an opinion that the dissolution of the government dissolved all pre-existing debts. The legislature were apprised that these creditors, being alien enemies, could not recover these debts at law, and that there was no danger of the enemy's hands being strengthened by payments obtained in that way. It was, nevertheless, desirable that as much of this money as could be collected with the consent of the debtors, should be paid to the government, to the end that the hands of the government might thereby be strengthened.

These and similar considerations probably induced the legislature to leave every debtor at liberty to pay as much or as little of his debt into the loan-office as he might from time to time think fit. It is at least doubtful whether the measure taken by this clause of the act, can, with propriety, be called sequestration: (1) Because the word "sequester" or "sequestration" is not used to operate it; (2) Because it does not extend to all debts under similar circumstances. but only to such as the debtor might think fit to pay; (3) Because it

permits a debt to be divided into as many parts as the debtor pleases, and at his pleasure attaches sequestration to one part, leaving the other parts free. But by whatever name this procedure may be called, its influence on the question before us is the only important object of inquiry. Here it may be proper to observe, that the debtor was perfectly at liberty to pay or not to pay, and to pay only as much, and at such times, as he might think fit. I take it for granted that a debtor cannot voluntarily transfer his obligation to pay to a third person, without the consent of his creditor; and that whenever he does it, the validity of that transfer must depend on the event of his creditor's afterwards ratifying it. When the debtor, in the present instance, voluntarily accepted the offers held out by the act, and without actual or legal constraint paid his debt to the state, agreeable to those offers and terms, he saw and yet exposed himself to the risk of the state's extinguishing the right and demand of the creditor either by payment at the end of the war, or by confiscating the money and making their receipt a good bar to an action, and also to the further risk of the provisions which the treaty of peace might make on the subject. But the state has not confiscated the money, nor have they paid it to the creditor. The creditor hath not released the debtor, nor hath he consented that the state shall be substituted in his place. Here three great questions arise: (1) Whether such discharge and substitution are valid by the laws of nations? (2) If not, whether they could be annulled by treaty? (3) If they could, then whether the treaty of peace does annul them?

1. Whether such discharge and substitution are valid by the laws of nations? This is a question on which I regret not having more time to investigate and reflect upon. If I was certain that the ideas which the legislature of Virginia appear to have entertained on this subject were accurate, I should have fewer doubts. They acknowledge, in the preamble of the act we have been considering, that these debts have been incurred under the sanction of the laws, and the connection before subsisting between the two countries. They acknowledge that Britain had not, to their knowledge, confiscated debts under the like circumstances, and that the public faith, and the laws and usages of nations, required that they should not be confiscated on their part. It is to be remarked, that Virginia hereby recognized the customary law of nations, and the respect due to it. They proceed to assert that they were justified by the same law and usages of nations in not strengthening the hand of their enemies, during the war, by remitting to them the interest or principal of such debts. From these declarations, it appears that all which the legislature conceived they were authorized by the law and usages of nations relative to these debts, was to prevent the payment of the interest or the principal during the war, lest the hands of their enemies should thereby be strengthened. If their power over such debts rightfully extended only to the prevention of such payments and remittances, then it will follow that they had no right, by the law and usages of nations, to change the nature of the debt, without the creditor's consent, nor without his consent to substitute one debtor for another. Their mere legislative powers could not operate such alterations in contracts so circumstanced; for, however extensively their constitution had authorized them to legislate for and over their own citizens, it could not give them authority to legislate for and over the subject of foreign powers residing out of their jurisdiction in foreign parts.

2. But supposing that the customary law of nations does permit and validate such discharge and substitution, or, as has been contended, that the customary law of nations had not been adopted by or did not extend over Virginia and the other United States, we are next to inquire: Whether they could be annulled by treaty? Here a wide field for investigation opens to our view, too wide to be minutely explored in the little time allowed me on this occasion. To me it appears to be a rule, that a treaty is competent to every stipulation which the interest of the contracting nations may indicate. A nation is a moral person composed of all the citizens comprehended in it. Their sovereign, duly authorized to treat with another nation, speaks their conjoint voice, pledges their conjoint faith, and makes their conjoint promises. It is questioned, whether a nation has a right, by a treaty of peace, to impair or destroy the private rights of citizens. No principle is better established, nor more generally acknowledged, than that the right of eminent domain is inseparably attached to national empire and sovereignty, and that it accompanies the right of making peace, whether that right be vested in one or in many hands. "Everything," says Vattel, "in the political society ought to tend to the good of the community; and if even the citizens' person is subject to this rule, their fortunes cannot be excepted." "The right belonging to the society, or to the sovereign, of disposing in cases of necessity, and for the public safety, of all the wealth contained in the state, is called the 'eminent domain.' It is evident that this right is necessary to him who governs, and is, consequently, a part of the empire or sovereign power." "If a nation disposes of the public property, in virtue of his eminent domain, the alienation is valid:" "When he disposes in like manner, in cases of necessity, of the possessions of a community or an individual, the alienation will be valid; but justice demands that this community or this individual be recompensed. It is necessary that nations should treat and transact their affairs with validity, without which they could have no method of terminating them, and of placing themselves in a state of tranquility. Whence it follows, that when a nation has ceded any part of its

property to another, the cession ought to be valid and irrevocable. The necessity of making a peace authorizes the sovereign to dispose of things even belonging to private persons, and the eminent domain gives him this right. But these cessions being made for the common advantage, the state is to indemnify the citizens who are sufferers by them. The domain of a nation extends to everything it possesses: the goods even of individuals in their totality, ought to be considered as the goods of the nation, in regard to other states; in short, it cannot be otherwise, since nations act and treat together in a body, in their quality of political societies, and as so many moral persons—all those who form a nation being considered by foreign states as making one whole, one single person. Its domestic regulations make no change in its right with respect to strangers." "When a field or house or garden, belonging to a private person, is made use of for building the rampart of a town or some other piece of fortification, when his standing corn or his store-houses are destroyed to prevent their being of use to the enemy, such damages are to be made good to the owner, who should bear only his quota. It is very evident, from the very act of civil or political association, that each citizen subjects himself to the authority of the entire body in everything that relates to the common welfare. The authority of all over each member, therefore, essentially belongs to the body politic of the state; but the exercise of it may be placed in different hands, as the society shall ordain." It would be useless to multiply authorities on a point so clear. These which have been adduced abundantly prove the authority and right of the nation to dispose of the goods and property of individual citizens whenever the safety and welfare of the state shall render it necessary; of this necessity the nation only, or the sovereign, are to judge; in such cases, the suffering individual is to be recompensed. I shall conclude my observations on this head with one made by an eminent writer. He compares a nation involved in war to a vessel in a storm, and justly remarks that in such cases it is better to cast goods and merchandise overboard than men. These rights belong to the nation, and, in my opinion, the exercise of them touching peace was clearly vested by the articles of confederation in the congress by whose authority the treaty of peace with Great Britain was concluded, and by whom it was ratified. The present national constitution recognizes that treaty among others. No objection, to my knowledge, hath ever been made in the councils of America to what I call its necessary validity; nor, in my opinion, is there the most distant reason for drawing it into question. From what has been said, it necessarily follows that the discharge and substitution in question were within the reach of a treaty, and were liable to be modified, impaired or totally annulled by it.

3. We are now arrived at the last question which remains to be decided, viz.: Whether this discharge and substitution is annulled by the definitive treaty of peace? The fourth article of that treaty is in these words, viz.: "It is agreed that creditors on either side shall meet with no lawful impediments to the recovery of the full value in sterling money of all bona fide debts heretofore contracted." Suppose such a man as Mr. Locke could be raised from the dead, and, without knowing anything of or concerning the treaty, this article was given him to decide, from the tenor of it, whether any creditors on either side, whether any lawful impediments, and whether any bona fide debts theretofore contracted, were excepted by any implication or construction growing out of and warranted by the terms in which the article is expressed, I think he would decide that there were none. To me the article appears to be plain, explicit and unequivocal; and that its true intent and meaning is so prominent and clear, as to require no rules of interpretation to discover or elucidate what the true intent and meaning of it is. Vattel lays it down as a maxim, "that it is not permitted to interpret what has no need of interpretation. When an act is conceived in clear and precise terms, when the sense is manifest, and leads to nothing absurd, there can be no reason to refuse the sense which this treaty naturally presents. To go elsewhere in search of conjectures in order to restrain or extinguish it, is to endeavor to elude it. If this dangerous method be once admitted, there will be no act which it will not render useless. Let the brightest light shine on every part of the piece; let it be expressed in terms the most clear and determinate; all this will be of no use, if it be allowed to search for foreign reasons in order to maintain what cannot be found in the sense it naturally presents."

Here it becomes necessary to inquire: (1) Whether the plaintiff is a creditor on either side? (2) Whether the payment into the loan-office, and the receipt and discharge thereupon given by Virginia to the debtor, is a lawful impediment? (3) Whether the debt sued for was a bona fide debt theretofore contracted? If these three questions are answered in the affirmative, the plaintiff ought to recover; if either of them is answered in the negative, judgment ought to be on this plea for the defendant.

1. Is the plaintiff a creditor on either side? It stands confessed by the record that he was a British creditor prior to the date of the receipt and discharges, the present validity of which is now in question. It is admitted that he has not received the amount of his debt, either from the debtor or from the state, and, therefore, being a British subject, to whom money is due from an American citizen or citizens, he is, in that sense, a creditor within the fourth article. There being no evidence that this money so due to him has been either released by him, or confiscated or forfeited by law, his right to demand and receive it

still remains perfect; so that he stands before the court and the treaty as a creditor entitled to the money due to him. It is objected that his debtor being discharged by act of Virginia, he had, before the treaty, ceased to be a creditor quoad that debtor. Suppose it so, yet he remained a creditor quoad the debt in the hands of the debtor's substitute, and, therefore, may, with propriety, be deemed and called a British creditor. It appears that Virginia so considered him, and, in her acts, called him a creditor, and that both before and after the treaty of peace. In the fourth section of the act last before mentioned, they direct the governor and council to make such allowances as they shall think reasonable out of the said profits and interest arising on money so paid into the loan-office, to the wives and children of such proprietors or creditors; nor could they consider him in any other light while their own certificate remained uncanceled. This certificate certifies that the defendant had paid into the loan-office a certain number of dollars, to be applied to his credit, in account with the plaintiff. There can be no credit where there is no creditor. In the second section of an act of Virginia, passed the 3d January, 1788, entitled "An act concerning moneys paid into the public loan-office in payment of British debts," are these words, "And whereas it belongs not to the legislature to decide particular questions of which the judiciary have cognizance, and it is, therefore, unfit for them to determine whether the payment so made into the loan-office as aforesaid be good or void between the creditor and debtor." Here, then, the legislature of Virginia recognizes the plaintiff in the capacity of creditor, and the defendant in that of debtor, although, with great delicacy, they forbear touching the question in difference between them. For these various reasons, I am of opinion that the plaintiff is one of the creditors mentioned in and intended by the fourth article of the treaty.

2. The next question is whether the receipt and discharge given by Virginia is a lawful impediment to the plaintiff's recovery? If it is not, I cannot conceive why it was pleaded as a bar; and if it is, I cannot see how it can consist with the treaty to let it stand as a barrier to the defendant against the plaintiff's recovery. But payment to the plaintiff is a lawful impediment to his recovery; and can it be supposed that the treaty meant to authorize a creditor to obtain a double payment? There is no doubt that such a construction cannot be admitted, and for the very reason which one of the defendant's counsel assigned, because such a construction would be inconsistent with common sense and common justice. But that is no reason why a construction consistent with both should not prevail, and that construction, in my opinion, is this, viz.: The lawful impediments mentioned are those which, on either side, had grown out of the war, and been caused by the hostile laws of either nation. The object of the treaty was peace, and to cause all hostilities, both military and civil, to cease. In pursuance of this object, it was stipulated that creditors should (as I understand the article) be restored to the free exercise of their rights as creditors, and that all impediments which hostile laws had interposed to prevent or suspend the recovery of their debts, should be done away. It appears to me that the act of Virginia, and everything done under it, the payment into the loan-office, the certificate taken out in the creditor's name, and the receipt and discharge given to the creditor, all grew out of the war; and so far as they affected the creditors, were, by this article, extinguished with it. If the lawful impediments created during the war by these payments into the loan-office, receipts and discharges, ought to be excepted, why was not that exception insisted on when the treaty was forming, and expressly mentioned and reserved in the article? We see, however, that the words are as general as they can be, and comprehend all lawful impediments.

This remark is confirmed by the second, third and fourth general maxims on the subject of the interpretation of treaties, viz.: (2) "If he who can and ought to have explained himself clearly and plainly, has not done it, it is the worse for him: he cannot be allowed to introduce subsequent restrictions which he has not expressed. The equity of this rule is extremely visible, and its necessity is not less evident. There can be no secure conventions, no firm and solid concession, if they may be rendered vain by subsequent limitations which ought to have been mentioned in the price, if they were included in the intentions of the contracting powers." (3) The third general maxim is, "that neither the one nor the other of the interested or contracting powers has a right to interpret the act or treaty at his pleasure. If I am allowed to explain my promises (to you) as I please, I may render them vain and illusive by giving them a sense quite different from that in which they were presented to you, and in which you must have taken them in accepting them." Which is most natural to suppose, that Great Britain understood this article as comprehending all lawful impediments, or as excluding a certain class of them? (4) The fourth maxim is, "On every occasion when a person has and ought to have shown his intention, we take for true against him what he has sufficiently declared." Can it be said that the United States could not have shown their intention to reserve and except these payments into the treasury, or that they ought not to have done it had they so intended, or that they have not sufficiently, in the fourth article, declared their intention to comprehend all lawful impediments? "This is an incontestable principle applied to treaties; for if they are not a vain play of words, the contracting parties ought to express themselves in them with truth and according to their real intentions. If the intention sufficiently declared was not

taken for the true intention of him who speaks and binds himself, it would be of no use to contract and form treaties." From the fourth article it appears evident that the debts due on either side had become a subject of negotiation; this is the only article in the treaty which respects them. The next clause, which is called the recommendatory clause, relates only to confiscated property; so that if the class of debts now in question (I mean those paid into the loan-office) shall, by construction, be deemed excluded from the fourth article, they will remain entirely unprovided for by the treaty; although it was exceedingly important to British creditors affected by those payments, that they should not have thus been passed over in silence. This silence respecting these debts cannot be accounted for otherwise than by supposing that both parties considered them as included within the terms of this article. But this article, according to the construction contended for, would, as to them, be rendered null and without effect; and yet it is a maxim in the law of nations, that "whatever tends to render an act null, and without effect, either in the whole or in part, and, consequently, whatever introduces any change in the things already agreed upon, is odious," and to be rejected. Again: "Everything that tends to the common advantage in conventions, or has a tendency to place the contracting powers on an equality, is favorable; and in such cases it is safest and most consistent with equity to extend the signification of the terms, than to limit them." These maxims apply strongly to the law before us.

The fourth article is perfectly reciprocal and equal No advantage is given to the one party which is not also given to the other. What right can we have to interpret the article to mean, that although no American creditors shall meet with lawful impediments, yet that some British creditors shall meet with lawful impediments? An interpretation so violent, so unauthorized by language of the treaty, and so destructive of the equality which characterizes it appears to me to be utterly inadmissible. That the creditor will meet with no lawful impediments in applying to the commonwealth for the money, is true; but that construction cannot consist with the treaty, which contemplates lawful impediments to recovery, and not to petitions or such like applications. "Recovery" is a word well understood; and when applied to debts or demands, means recovery by process and course of law. At that time states were not liable to actions, nor could it then have been foreseen or conjectured, that they would be in future. In short, I am, for my part, well persuaded that the receipt and discharge pleaded, is one of the lawful impediments mentioned in the treaty, and, therefore, that it ought not to stand in the way of the plaintiff's recovery. Let the state repay the money to the defendant, and neither the state nor the parties will have reason to complain of the treaty, nor of injustice. We confiscated British property to an immense amount, and, under the recommendatory article, still keep it. Under the fourth article, all American creditors are secured, and it is but fair that all British creditors should be so likewise. Britain neither sequestered nor confiscated any of our property; she interposed no lawful impediments to the recovery of our debts. Equality in treaties is favored by the law of nations, and every of its maxims applicable to the case, ought to confine us to the reciprocity and equality which marks this article.

3. The only question which remains to be decided is whether the debt sued for was a bona fide debt theretofore contracted. It stands admitted by the record that the debt was theretofore contracted. Nothing appears to induce a doubt of its having been bona fide contracted. It is not pretended that it hath ever been paid to the creditor, or released or forfeited by him. It is, therefore, a debt bona fide due as well as bona fide contracted. The payment to the state was no payment to him; admit that he thereby lost his right to demand it of the debtor in the courts of Virginia, until after the peace, yet the treaty, as I understand it, restored him the exercise of that right by removing the lawful impediments which the law of that state, and the acts done under it, had during the war created.