(Slip Opinion)

# Congressionally Mandated Notice Period for Withdrawing from the Open Skies Treaty

In establishing a mandatory waiting period for withdrawing from a treaty, section 1234(a) of the National Defense Authorization Act for Fiscal Year 2020 unconstitutionally interferes with the President's exclusive authority to execute treaties and to conduct diplomacy.

September 22, 2020

## MEMORANDUM OPINION FOR THE LEGAL ADVISOR TO THE NATIONAL SECURITY COUNCIL

The United States is a party to the Open Skies Treaty, which allows state parties to conduct unarmed surveillance flights over the territory of the other parties. Treaty on Open Skies, Mar. 24, 1992, *reprinted in* S. Treaty Doc. No. 102-37 (Aug. 12, 1992) ("OST"); 2 Pub. Papers of Pres. William J. Clinton app. A, at 2213 (Nov. 3, 1993). Article XV of the Treaty gives each party the right to withdraw after providing notice, at least six months in advance, to a Treaty depositary and to the other state parties. In section 1234(a) of the National Defense Authorization Act for Fiscal Year 2020 ("FY 2020 NDAA"), Congress sought to require the Executive Branch to notify four congressional committees, at least 120 days in advance of sending the notice, that withdrawal is in the best interests of the United States national security and that the other state parties to the Treaty have been consulted about the United States' planned withdrawal. Pub. L. No. 116-92, § 1234(a), 133 Stat. 1198, 1648 (2019).

On May 22, 2020, the Secretary of State and the Secretary of Defense jointly provided notice to congressional leadership of the President's decision that the United States would withdraw from the Treaty. *See* Letter for Nancy Pelosi, Speaker of the House, U.S. House of Representatives, from Michael R. Pompeo, Secretary of State, and Mark T. Esper, Secretary of Defense (May 22, 2020) ("Notification Letter"); *see also* Michael R. Pompeo, U.S. Dep't of State, Press Release, *Press Statement on the Treaty on Open Skies* (May 21, 2020), https://www.state.gov/on-the-treaty-on-open-skies/. Consistent with section 1234(a), the Secretaries confirmed that withdrawal was in the best interests of the United States national security and that the Department of State had consulted extensively with other state parties. But they further explained that the Presi-

1

dent had directed that the notice of withdrawal be sent immediately, without waiting for the 120 days called for by section 1234(a). Notification Letter at 2.

Before the President gave that direction, you asked whether section 1234(a)'s mandatory congressional-notice period is constitutional. We advised that the notice period unconstitutionally interferes with the President's exclusive authority to execute treaties and to conduct diplomacy, a necessary incident of which is the authority to execute a treaty's termination right. Congress may not intrude upon the President's authority to speak as the voice of the United States in executing a treaty by imposing the notice-and-wait provision called for under section 1234(a). This memorandum memorializes the basis for that conclusion.

## I.

President George H.W. Bush signed the Open Skies Treaty on behalf of the United States in Helsinki, Finland, on March 24, 1992, along with representatives of the Russian Federation and other nations. *See Message to the Senate Transmitting the Treaty on Open Skies* (Aug. 12, 1992), 2 Pub. Papers of Pres. George Bush 1345, 1345–46 (1992) ("OST Message"). The Treaty allows each state party to conduct a limited number of unarmed observation flights over the territory of other parties. *See* OST arts. I–IX. Data obtained from these flights may then be shared among the parties. *See id.* art. IX, § IV; *see also id.* art. X, ¶ 5 (allowing the Open Skies Consultative Commission to develop "arrangements for the sharing and availability of data"). The Treaty was intended, among other things, to "improve openness and transparency," "to enhanc[e] security," "to facilitate the monitoring of compliance with existing or future arms control agreements," and "to strengthen the capacity for conflict prevention and crisis management." *Id.* pmbl.

The idea for the Open Skies Treaty originated in the early years of the Cold War, but it did not enter into force until a good deal later. President Eisenhower first proposed the idea for a regime of mutual unarmed reconnaissance flights in 1955, as a confidence-building measure between the superpowers. But it was not until 1989, as the Cold War entered its last years, that President George H.W. Bush began negotiating a multilateral agreement for such a regime. *See Treaty on Open Skies*, S. Exec. Rep. No.

103-5, at 2 (1993). President Bush signed the agreement in 1992 and submitted it to the Senate for advice and consent. OST Message at 1345.

In considering whether to recommend that the Senate provide its advice and consent to ratification, the Senate Committee on Foreign Relations observed that the Treaty "will be of marginal direct benefit to the United States" and that there was a "general consensus within the United States Government that the treaty will not provide any significant information gains to this nation." S. Exec. Rep. No. 103-5, at 16. The Treaty's original impetus had been "overtaken" in part by the advent of satellite technology, which offered better data-acquisition capabilities. *See id.* at 2–3. In addition, the Senate Armed Services Committee expressed concern about "the cost-effective use of Department of Defense resources under the Treaty" and viewed the "overall cost-benefit to the U.S." as "questionable." *Id.* at 142–43, 15. Nonetheless, the Committee on Foreign Relations concluded that the Treaty was "not likely to jeopardize United States national security," *id.* at 16, and the Senate consented to the Treaty subject to two conditions (neither of which bears on withdrawal). *See* 139 Cong. Rec. 19,913 (1993). On November 2, 1993, President Clinton signed the instrument of ratification.[1] The Treaty did not finally enter into force, however, until January 1, 2002, *see* Treaty Affairs Staff, Office of the Legal Adviser, U.S. Dep't of State, *Treaties in Force: A List of Treaties and Other International Agreements of the United States in Force on January 1, 2020* § 2, at 2, after the requisite number of nations had acceded to it, *see* OST art. XVII, ¶ 2. At present, 34 states, including the United States, are parties to the Treaty.

The Open Skies Treaty is of unlimited duration. *Id.* art XV, ¶ 1. But it provides that a state party "shall have the right to withdraw from this Treaty," and that a party intending to withdraw "shall provide notice of its decision to withdraw to either Depositary at least six months in advance of the date of its intended withdrawal and to all other States Parties." *Id.* art. XV, ¶ 2. Should a state party provide such notice, the Treaty directs the two depositary governments (Canada and Hungary, *see id.* art. XVII)

---

[1] *Departments of Commerce, Justice, and State, the Judiciary, and Related Agencies Appropriations for 1995: Hearings Before the Subcomm. on the Dep'ts of Commerce, Just. & State, the Judiciary & Related Agencies of the H. Comm. on Appropriations*, 103d Cong. 207 (1994).

to convene a conference of the state parties "to consider the effect of the withdrawal on this Treaty." *Id.* art. XV, ¶ 3.

In recent years, United States military officials expressed concerns that the Treaty's implementation had undermined the national security of the United States. Some observed that Russia received a much greater advantage than the United States from the overflight rights.[2] Others complained that Russia had regularly breached its obligations under the Treaty and thereby undermined its benefits.[3] For these and other reasons, United States officials discussed the possibility of withdrawing.[4]

---

[2] *See, e.g.*, *Hearing to Consider the Nomination of General Joseph F. Dunford, Jr., USMC, for Reappointment to the Grade of General and Reappointment to Be Chairman of the Joint Chiefs of Staff Before the S. Comm. on Armed Servs.*, 115th Cong. 49 (2017) ("Dunford Hearing") (statement of Gen. Dunford) (calling "compelling" the argument that "Russia gets more benefit from [OST] flights than does the United States"); *Worldwide Threats: Hearing Before the H. Comm. on Armed Servs.*, 114th Cong. 13 (2015) (statement of Lt. Gen. Vincent R. Stewart, Dir., Def. Intelligence Agency) ("The Open Skies construct was designed for a different era. I am very concerned about how it's applied today."); *Russian Arms Control Cheating: Violation of the INF Treaty and the Administration's Responses One Year Later: Joint Hearing Before the Subcomm. on Strategic Forces of the H. Comm. on Armed Servs. & the Subcomm. on Terrorism, Nonproliferation & Trade of the H. Comm. on Foreign Affairs*, H.A.S.C. No. 114-70, 114th Cong. 15 (2015) ("Russian Arms Control Hearing") (according to the head of U.S. Strategic Command, the "treaty has become a critical component of Russia's intelligence collection capability directed at the United States," and Russian overflights create "vulnerabilities" for the United States); *see also* Senator Tom Cotton, *The Open Skies Treaty Is Giving Russia Spying Capabilities. End It.*, Wash. Post (Dec. 10, 2019), https://www.washingtonpost.com/opinions/2019/12/10/open-skies-treaty-is-giving-russia-spying-capabilities-end-it/ ("[T]he Open Skies Treaty no longer serves to reduce tensions or build trust, if it ever did. Instead it gives Russia a spying capability it wouldn't otherwise possess, which jeopardizes U.S. security.").

[3] *See, e.g.*, U.S. Dep't of State, *Adherence to and Compliance with Arms Control, Nonproliferation, and Disarmament Agreements and Commitments* 30 (Apr. 2016) ("Russia continues not to meet its treaty obligations [under the OST.]"); U.S Dep't of State, *Adherence to and Compliance with Arms Control, Nonproliferation, and Disarmament Agreements and Commitments* 26–27 (Aug. 2012) (observing that, on multiple occasions, "the United States, Romania, Canada," and other nations have raised concerns about Russia's noncompliance with the Treaty).

[4] *See, e.g.*, Dunford Hearing at 48–49 (statement of Gen. Dunford) ("we don't believe the treaty should be in place if the Russians aren't complying"); *Review of the Fiscal Year 2017 State Department Budget Request: Hearing Before the S. Comm. on Foreign Rela-*

At the same time, some Members of Congress expressed concern that the United States' withdrawal from the Treaty would undermine national security or disrupt relations with the United States' allies. *See, e.g.*, 165 Cong. Rec. S5915 (daily ed. Oct. 21, 2019) (statement of Sen. Menendez) ("Withdrawing from the Open Skies Treaty would be perceived as casting . . . further doubt on the status of the U.S. commitment to Ukraine's security and would advance the Russian narrative that the United States is an unreliable partner in the region."); Letter for Robert C. O'Brien, National Security Adviser, White House, from Eliot L. Engel, Chairman, Committee on Foreign Relations, U.S. House of Representatives at 1 (Oct. 7, 2019) ("Th[e] treaty has provided important military transparency for its 34 signatory countries" and "[w]ithdrawal risks dividing the transatlantic alliance and would further undermine America's reliability as a stable and predictable partner when it comes to European security[.]"); Senator Deb Fischer, Press Release, *Fischer, Fortenberry, Bacon Applaud Open Skies Funding in FY2019 Defense Funding Bill* (Sept. 14, 2018) ("The Open Skies Treaty . . . contributes significantly to greater transparency and stability across many key regions of the globe, which benefits both the United States and our allies and partners.").

Against this backdrop, the House Armed Services Committee in 2019 proposed including a provision in the FY 2020 defense authorization bill that would have restricted the President's discretion to withdraw from the Treaty.[5] In response, the Department of Justice objected that such a meas-

---

*tions*, 114th Cong. 148 (2016) (statement of Sen. Barrasso) (asking whether "this treaty has outlived its original intention and the United States should withdraw"); Russian Arms Control Hearing at 16–17 (statement of Rep. Bridenstine) (raising the possibility that "maybe we don't need [the OST] anymore"); *see also* Cotton, *supra* note 2 ("Withdrawing from Open Skies . . . would allow us to restrict Russian spy flights over the most sensitive U.S. military installations without damaging our ability to monitor theirs" and would free up funding that could be "better spent on tools that increase the combat effectiveness and survivability of U.S. troops.").

[5] The House bill would have generally barred the obligation of any of "the funds authorized to be appropriated by this Act or otherwise made available to the Department of Defense for fiscal year 2020" to support "any action to suspend, terminate, or withdraw the United States from the Open Skies Treaty." H.R. 2500, 116th Cong. § 1231(c)(1) (2019). The bill would have made an exception if the Secretary of State and the Secretary of Defense jointly certified to Congress either that "Russia is in material breach of its obligations under the Open Skies Treaty and is not taking steps to return to compliance with such obligations, and all other state parties to the Open Skies Treaty concur in such

ure would unconstitutionally intrude on the President's exclusive power to withdraw from a treaty. *See* Letter for Adam Smith, Chairman, Committee on Armed Services, U.S. House of Representatives, from Prim F. Escalona, Principal Deputy Assistant Attorney General, Office of Legislative Affairs at 8–9 (Nov. 27, 2019), https://www.justice.gov/ola/page/file/1222061/download (second document).

Congress nonetheless enacted a revised version of this restriction in section 1234(a) of the NDAA, which provides:

> Not later than 120 days before the provision of notice of intent to withdraw the United States from the Open Skies Treaty to either treaty deposit[a]ry pursuant to Article XV of the Treaty, the Secretary of Defense and the Secretary of State shall jointly submit to the congressional defense committees, the Committee on Foreign Affairs of the House of Representatives, and the Committee on Foreign Relations of the Senate a notification that—(1) such withdrawal is in the best interests of the United States national security; and (2) the other state parties to the Treaty have been consulted with respect to such withdrawal.

FY 2020 NDAA § 1234(a), 133 Stat. at 168. In signing the FY 2020 NDAA into law, the President reiterated the Department's constitutional concerns and advised that that he would apply section 1234(a) only to the extent "such advance certification or notification is feasible and consistent with [his] exclusive constitutional authorities" to conduct the Nation's foreign relations. *Statement on Signing the National Defense Authorization Act for Fiscal Year 2020*, 2019 Daily Comp. Pres. Doc. No. 880, at 1 (Dec. 20, 2019) ("NDAA Signing Statement").

In May 2020, you asked for this Office's views on whether the United States may submit a notice of withdrawal from the Open Skies Treaty without complying with the advance-notice requirement of section 1234(a). We advised that this 120-day waiting period unconstitutionally restricts the President's authority to execute the rights of the United States

---

determination of the Secretaries"; or that "withdrawing from the Open Skies Treaty would be in the best interests of United States national security and the other state parties to the Open Skies Treaty have been consulted with respect to such withdrawal." *Id.* § 1231(c)(2).

under treaties and to conduct diplomacy, and that the President could therefore submit a notice of withdrawal immediately. Consistent with the President's signing statement, we advised that, as a matter of interbranch comity, the President should comply with the terms of the waiting period insofar as it would be feasible and consistent with the diplomatic objectives of the United States.

On May 22, 2020, the Secretary of State and the Secretary of Defense advised Congress that the President had determined that it was no longer in the national security interest for the United States to remain a party to the Open Skies Treaty. *See* Notification Letter at 1. The secretaries explained that, since at least 2011, Russia has regularly violated the Treaty's terms, thereby undermining the central confidence-building object of the Treaty. *Id*. For example, Russia has limited the flight distance that state parties may fly during missions over Kaliningrad; Russia prohibits Treaty flights within 10 kilometers of portions of the Russian–Georgian border; and Russia in September 2019 denied overflight of a Russian military exercise—all of which violated the Treaty. *Id.* Although the United States derives no intelligence benefit from the Treaty, Russia gains valuable intelligence from its overflights, which it can use to target critical civilian infrastructure in the United States and Europe. *Id.* Finally, Russia attempts to advance its "expansionist propaganda" through the Treaty by prohibiting flights near Georgia and by providing for an open-skies refueling airfield within Ukraine, in Russian-occupied Crimea. *Id.*

The secretaries confirmed that, consistent with section 1234(a), the Department of State had consulted extensively with other state parties to the Treaty about the prospect of United States withdrawal. *Id.* at 2. As the secretaries explained, "[t]hose consultations have been tailored to help State[] Parties understand and mitigate the risks from their own continued participation in the Treaty, and to lay the foundation for providing overhead imagery to fill any gaps resulting from the United States' withdrawal." *Id.* Although those consultations would continue, the secretaries advised that the President had determined that waiting an additional 120 days before submitting the notice of withdrawal would be contrary to the national security. *Id.* Because Congress could not constitutionally require the President to wait 120 days before executing an authority vested in the President by the Constitution, the President had directed the Secretary of State to submit the notice immediately. *Id.* at 2–3.

## II.

In enacting section 1234(a), Congress sought to regulate the President's authority to withdraw the United States from the Open Skies Treaty. Article II of the Constitution vests the President with the authority to exercise the right of the United States under a treaty to withdraw from the agreement. That proposition, while occasionally disputed during the early Republic, has since become firmly entrenched in the practice of our government. *See Authority to Withdraw from the North American Free Trade Agreement*, 42 Op. O.L.C. __, at *7–13 (Oct. 17, 2018) ("*NAFTA Withdrawal*"); *id.* at *12 ("In view of the[] historical examples of presidential action, combined with what has usually been congressional acquiescence, there can no longer be serious doubt that the President may terminate a treaty in accordance with its terms.").[6] As the Chief Executive, the President bears the constitutional responsibility to execute the laws and treaties of the United States. *See, e.g.*, *United States v. Schooner Peggy*, 5 U.S. (1 Cranch) 103, 109 (1801) (recognizing that "the execution of a contract between nations is to be demanded from, and, in the

---

[6] *Accord* Memorandum for Robert F. Hoyt, General Counsel, U.S. Dep't of the Treasury, from Steven G. Bradbury, Principal Deputy Assistant Attorney General, Office of Legal Counsel, *Re: President's Authority to Terminate or Amend a Certain Congressional-Executive Agreement* at 5 (May 9, 2008); *Validity of Congressional-Executive Agreements That Substantially Modify the United States' Obligations Under an Existing Treaty*, 20 Op. O.L.C. 389, 395 n.14 (1996) ("[T]he executive branch has taken the position that the President possesses the authority to terminate a treaty in accordance with its terms by his unilateral action[.]"); Memorandum for Cyrus Vance, Secretary of State, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, *Re: Proposed Reservation to SALT II Conditioning Termination on Senate Approval* at 1 (Nov. 13, 1979); *Goldwater v. Carter*, 617 F.2d 697, 699–708 (D.C. Cir. 1979) (en banc) (per curiam) (upholding President Carter's authority to terminate a mutual defense treaty with the Republic of China according to the treaty's terms), *vacated*, 444 U.S. 996 (1979); Restatement (Fourth) of the Foreign Relations Law of the United States § 113(1) (Am. Law Inst. 2018) ("According to established practice, the President has the authority to act on behalf of the United States in . . . withdrawing the United States from treaties . . . on the basis of terms in the treaty allowing for such action (such as a withdrawal clause)[.]"); Louis Henkin, *Foreign Affairs and the United States Constitution* 213–14 (2d ed. 1996) (explaining that it is now "accepted that the President has the authority to denounce or otherwise terminate a treaty"); Curtis A. Bradley, *Exiting Congressional-Executive Agreements*, 67 Duke L.J. 1615, 1623 (2018) (observing that the Senate "knows that presidents claim authority to invoke withdrawal clauses unilaterally" and "routinely consents to treaties containing such clauses").

general, superintended by the executive of each nation"). And as the Nation's sole diplomatic representative, the President is the one voice who speaks for the United States before foreign states. *See, e.g.*, *Zivotofsky v. Kerry*, 576 U.S. 1, 14 (2015); *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 424 (2003) (recognizing that the President must have the "capacity . . . to speak for the Nation with one voice in dealing with other governments" (alteration and quotation marks omitted)). Both of these powers underscore that the President has the authority and discretion to execute the United States' right to withdraw from a treaty.

Because a statute that purports to restrict the President from exercising that right would raise serious constitutional questions, we consider first whether section 1234(a) in fact does so. Section 1234(a) implicitly acknowledges that the President may withdraw the United States from the Open Skies Treaty by its terms in presuming that the President may provide "notice of intent to withdraw" to the depositaries of the treaty. *See* FY 2020 NDAA § 1234(a). The statute, however, would require not the President, but his subordinates, the Secretary of State and the Secretary of Defense, to provide 120 days' notice of any such decision and to make certain certifications based on it. *See id.* The structure of the statute is a bit awkward, because the secretaries are obliged to inform Congress in advance of a presidential decision of which they may have no control or potentially even knowledge. Given this mismatch between the statutory reporters and the presidential decision-maker, an argument could be made that the statute requires only that the secretaries use their best efforts to provide notice should the President give them the information and time to do so. Such a reading might avoid the constitutional question presented by an absolute restriction on the President's discretion to withdraw the United States from the Open Skies Treaty.

We do not think that the question is so easy, however, because the President himself must take care that his subordinates faithfully comply with the law. As the Supreme Court has explained, "Article II confers on the President the general administrative control of those executing the laws. It is *his* responsibility to take care that the laws be faithfully executed. The buck stops with the President, in Harry Truman's famous phrase." *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 492–93 (2010) (citation and quotation marks omitted). That responsibility includes not just complying with the law, but ensuring that his subordinates

do as well. Although the President could surely communicate the notice of withdrawal himself, or through other subordinates, he ordinarily would rely upon the Secretary of State to transmit that decision and would seek the advice of both secretaries before doing so. We presume that Congress enacted the statute against the backdrop of these relationships. *See, e.g.*, *Proposed Executive Order Entitled "Federal Regulation,"* 5 Op. O.L.C. 59, 61 (1981). Since the President would have discretion to provide the secretaries with the required notice, we believe that if the statute were constitutional, then he should take care to avoid creating a circumstance where they would fail to comply. We therefore read section 1234(a) as effectively imposing a requirement that the President not submit the notice of withdrawal until 120 days after Congress receives notice of the President's intent and the secretaries have made the required certifications. The question remains whether such a restriction is constitutional.

## III.

The decision to withdraw from the Open Skies Treaty implicates the President's exclusive constitutional authorities to execute a treaty of the United States and to conduct the Nation's diplomacy. The Constitution vests the President with all of the "executive Power" of the United States, U.S. Const. art. II, § 1, cl. 1, and it assigns to the President "plenary powers . . . as the head of the State in [the Nation's] relations with foreign countries." *Acquisition of Naval and Air Bases in Exchange for Over-Age Destroyers*, 39 Op. Att'y Gen. 484, 489–90 (1940) (Jackson, A.G.); *see also, e.g.*, *First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759, 766 (1972) (describing the "exclusive competence of the Executive Branch in the field of foreign affairs"). Although Congress may legislate on topics that affect foreign affairs, Congress's authority does not extend to regulating the President's decision to exercise a right of the United States to withdraw from a treaty. Accordingly, section 1234(a) unconstitutionally restricts the President's discretion to withdraw the United States from the Open Skies Treaty.

## A.

The Constitution vests the President with the "executive Power" of the United States. U.S. Const. art. II, § 1, cl. 1. As the Supreme Court recent-

ly observed, "the entire 'executive Power' belongs to the President alone." *Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2197 (2020). The Constitution further confers upon the President express powers relating to foreign affairs, including the power to direct the military as "Commander in Chief," U.S. Const. art. II, § 2, cl. 1; to "make" treaties, after receiving the advice and consent of the Senate, *id.* art. II, § 2, cl. 2; to appoint "Ambassadors," "public Ministers and Consuls," *id.*; and to receive "Ambassadors and other Public Ministers," *id.* art. II, § 3. Taken together, these provisions grant the President the authority and discretion to implement a treaty by notifying foreign powers of the United States' exercise of its right to withdraw from the treaty.

The Constitution entrusts the President with the "vast share of responsibility for the conduct of our foreign relations." *Garamendi*, 539 U.S. at 429. That responsibility includes the "exclusive authority to conduct diplomacy on behalf of the United States." Memorandum for Jennifer G. Newstead, Legal Adviser, U.S. Dep't of State, from Steven A. Engel, Assistant Attorney General, Office of Legal Counsel, *Re: Constitutionality of Statutory Restrictions on the PLO's Diplomatic Activities* at 7 (Sept. 11, 2018) ("*PLO's Diplomatic Activities*").[7] The President, for instance, has the "'exclusive authority to determine the time, scope, and objectives'

---

[7] *Accord Unconstitutional Restrictions on Activities of the Office of Science and Technology Policy in Section 1340(a) of the Department of Defense and Full-Year Continuing Appropriations Act*, 35 Op. O.L.C. __, at *3–4 (Sept. 19, 2011); *Presidential Certification Regarding the Provision of Documents to the House of Representatives Under the Mexican Debt Disclosure Act of 1995*, 20 Op. O.L.C. 253, 267 (1996); *see also, e.g.*, *In re Hennen*, 38 U.S. (13 Pet.) 230, 235 (1839) ("As the executive magistrate of the country, [the President] is the only functionary intrusted with the foreign relations of the nation."); S. Doc. No. 56-231, pt. 8, at 21 (1901) ("The President is the constitutional representative of the United States with regard to foreign nations. He manages our concerns with foreign nations, and must necessarily be most competent to determine when, how, and upon what subjects negotiation may be urged with the greatest prospect of success."); 10 Annals of Cong. 613 (1800) (statement of then-Rep. John Marshall) ("The President is the sole organ of the nation in its external relations, and its sole representative with foreign nations."); Letter for Edmond Charles Genet from Thomas Jefferson, Secretary of State (Nov. 22, 1793), 27 *The Papers of Thomas Jefferson* 414, 415 n. (1997) (explaining, in letter approved by President Washington and his Cabinet that, because the President is "the only channel of communication between this country and foreign nations, it is from him alone that foreign nations or their agents are to learn what is or has been the will of the nation, and whatever he communicates as such, they have a right and are bound to consider as the expression of the nation").

of international negotiations." *Prohibition of Spending for Engagement of the Office of Science and Technology Policy with China*, 35 Op. O.L.C. 116, 121 (2011) (quotations omitted) ("*Engagement of OSTP with China*"); *see also Earth Island Inst. v. Christopher*, 6 F.3d 648, 652 (9th Cir. 1993) ("[A] statute's requirement that the Executive initiate discussions with foreign nations violates the separation of powers[.]"). It is "imperative" that, "[i]n the conduct of negotiations with foreign governments," the "United States speak with one voice," and the Constitution's overriding design is that this "one voice is the President's." *Issues Raised by Foreign Relations Authorization Bill*, 14 Op. O.L.C. 37, 40 (1990) (quoting *Message to the Senate Returning Without Approval the Bill Prohibiting the Export of Technology for the Joint Japan-United States Development of FS-X Aircraft* (July 31, 1989), 2 Pub. Papers of Pres. George H.W. Bush 1042, 1043 (July 31, 1989)).

The Constitution also assigns to the President the responsibility to make treaties. The President has "the sole power to negotiate treaties." *Zivotofsky*, 576 U.S. at 13. The Senate must provide its advice and consent before a treaty may be valid. U.S. Const. art. II, § 2, cl. 2. But even when the Senate consents, the President still must decide to bring the treaty into effect by ratifying the treaty. *See, e.g.*, *Relevance of Senate Ratification History to Treaty Interpretation*, 11 Op. O.L.C. 28, 32 (1987) (observing that, even after the Senate provides consent, "the President may . . . refuse to ratify the treaty"); Restatement (Fourth) of the Foreign Relations Law of the United States § 303 reporter's note 5 (Am. Law Inst. 2018) ("Restatement (Fourth)") (explaining that, after the Senate approves a treaty, then the ensuing "decision whether to ratify the treaty—and to take the associated steps to bring the treaty into legal force for the United States—is vested wholly in the President"). Whether to ratify a treaty is itself a judgment that falls within the executive power of the President.

The President's exclusive authority over diplomacy extends not only to the making of treaties, but to their maintenance as well. The Supreme Court has long recognized that "the execution of a contract between nations is to be demanded from, and, in the general, superintended by the executive of each nation." *Schooner Peggy*, 5 U.S. at 109; *see also United States v. The Amistad*, 40 U.S. (15 Pet.) 518, 571–72 (1841) (recognizing that the President's responsibility to execute the laws "is, if possible, more imperative" with respect to the execution of treaties than statutes,

"since the execution of treaties being connected with public and foreign relations, is devolved upon the executive branch"); *Goldwater v. Carter*, 444 U.S. 996, 1000 n.1 (1979) (Powell, J., concurring in judgment) (recognizing the President's "duty to execute" treaty provisions). We have thus recognized that "[i]t belongs exclusively to the President to interpret and execute treaties," and that this power "necessarily includes the power to determine whether, and how far, the treaty remains in force." *Constitutionality of Legislative Provision Regarding ABM Treaty*, 20 Op. O.L.C. 246, 248–49 (1996).

The President's power to withdraw from an international agreement follows from these constitutional authorities. Deciding whether to withdraw from a treaty is not only a quintessentially executive decision, but it is also one that invariably requires the conduct of diplomacy. *See, e.g.*, Vienna Convention on the Law of Treaties art. 67, ¶ 2, *opened for signature* May 23, 1969, 115 U.N.T.S. 331 (requiring that a decision to withdraw be communicated by formal diplomatic notice).[8] Withdrawal from a treaty is a diplomatic act reserved for the President and committed to his judgment. *See NAFTA Withdrawal* at 14–15 ("The diplomatic responsibility for communicating that notice would rest squarely with the President."); *see also Constitutionality of the Rohrabacher Amendment*, 25 Op. O.L.C. 161, 166 (2001) (recognizing the President's "responsibility for treaty interpretation and enforcement, and the authority to place the United States in breach of a treaty or even to terminate it, should the President find that advisable"); S. Comm. on Foreign Relations, 106th Cong., *Treaties and Other International Agreements: The Role of the United States Senate* 201 (Comm. Print 2001) (noting that "the termination of the outstanding international obligation seems to reside in the President since he alone is able to communicate with foreign powers").

The President's responsibility to execute the United States' right of withdrawal necessarily includes discretion to determine whether and when he should do so. President Carter, for example, gave effect to his decision to recognize the People's Republic of China as a sovereign by terminating

---

[8] Although the United States has not ratified the Vienna Convention on the Law of Treaties, we have recognized that many of its provisions reflect customary international law. *See, e.g.*, *Authority of the President Under Domestic and International Law to Use Military Force Against Iraq*, 26 Op. O.L.C. 143, 164 n.24 (2002); *Trade Act Restrictions on the Extension of Most-Favored-Nation Rights*, 11 Op. O.L.C. 128, 134 n.13 (1987).

a mutual defense treaty with Taiwan. *See Goldwater*, 617 F.2d at 707–08. As the D.C. Circuit explained, determining how to maintain international relationships is "a field in which the President, not Congress, has responsibility under our Constitution." *Id.* at 708. The decision to terminate a treaty often requires "immediate action," and the President must make "active policy determination[s] as to the conduct of the United States in regard to a treaty in response to numerous problems and circumstances as they arise." *Id.* at 706–07. The decision is likewise an aspect of the President's "'unique role in communicating with foreign governments,' and Congress may not compel the President to contradict [the] message" he chooses to send in doing so. *PLO's Diplomatic Activities* at 8 (quoting *Zivotofsky*, 576 U.S. at 21).

The Supreme Court's decision in *Zivotofsky* reinforces the conclusion that the President's authority to exercise the United States' right to withdraw from a treaty is exclusive. There, the Court considered the constitutionality of a federal statute that allowed U.S. citizens born in Jerusalem to list their place of birth as "Israel," in conflict with the President's policy at the time not to recognize Israeli sovereignty over that city. *See Zivotofsky*, 576 U.S. at 5–7. The Court concluded that the statute was unconstitutional because the President has the exclusive authority to recognize foreign sovereigns, a power that flows from the President's constitutionally delineated powers to receive and appoint ambassadors, and from the "lack of any similar power vested in Congress." *Id.* at 14. The statute unconstitutionally interfered with the President's recognition authority, which requires the Nation to "speak with one voice" regarding such decisions. *Id.* (alteration and quotation marks omitted). "It was an improper act," the Court explained, "for Congress to 'aggrandize[e] its power at the expense of another branch' by requiring the President to contradict an earlier recognition decision in an official document issued by the Executive Branch." *Id.* at 31–32 (quoting *Freytag v. Comm'r*, 501 U.S. 868, 878 (1991)). "To allow Congress to control the President's communication," the Court continued, "is to allow Congress to exercise that exclusive power itself." *Id.* at 32.

We think that the same conclusion follows here. The Constitution grants the President the power to execute the treaties of the United States, and it does not provide Congress with any parallel responsibility. Just as the recognition power is an exclusive power of the President arising as an

incident to his other constitutional authorities, *see id.* at 14, his power to exercise the United States' right to terminate a treaty is an exclusive power that is part of the President's executive power, treaty-making power, and diplomatic power. No less than the power to recognize foreign sovereigns, the decision to withdraw from a treaty "is a topic on which the Nation must speak with one voice." *Id.* (alteration and quotation marks omitted). We think that, when the President has spoken for the Nation on the international plane, Congress may not enact legislation that delays or obstructs that decision with a conflicting diplomatic message. As in *Zivotofsky*, if we were to acknowledge Congress's power to regulate the conditions and timing of the President's decision to exercise the United States' right of withdrawal from a treaty, we would be accepting the proposition that Congress may itself exercise that exclusive power of the President.

## B.

Section 1234(a) contravenes an exclusive power of the President, and it may not be justified as the exercise of any concurrent power of Congress. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring). Congress "clearly possesses significant article I powers in the area of foreign affairs, including with respect to questions of war and neutrality, commerce and trade with other nations, foreign aid, and immigration." *Legislation Prohibiting Spending for Delegations to U.N. Agencies Chaired by Countries That Support International Terrorism*, 33 Op. O.L.C. 221, 225–26 (2009) ("*Delegations to U.N. Agencies*"). And there may well be cases where Congress's exercise of those powers would permissibly affect the foreign relations of the United States. But section 1234(a) does not present any conflict between an authority of the President and a congressional regulation of war, foreign commerce, immigration, or any other power of Congress. To the contrary, the statute directly regulates the actions of the Executive Branch, and specifically seeks to restrict its authority to communicate with foreign nations about the execution of a right of the United States under an existing treaty.

Section 1234(a) likewise is not an exercise of Congress's authority to adopt laws to implement treaties as part of our domestic law. *See Bond v. United States*, 572 U.S. 844, 855 (2014). Rather, section 1234(a) purports

to regulate the President's actions on the international stage by operating directly upon his subordinates on a decision whether to take diplomatic action. The power of Congress to implement a treaty does not itself imply a power to direct the President to engage in diplomacy or control the manner by which the President executes the rights of the United States under treaties.

Nor may section 1234(a) be justified on the ground that Congress may adopt measures that create obligations under our domestic law supplementing or even conflicting with treaty obligations. Because an act of Congress is equivalent under our domestic law to that of a self-executing treaty, when Congress exercises its regulatory authorities, it may modify a treaty's domestic effect through the enactment of subsequent legislation. *See, e.g.*, *Validity of Congressional-Executive Agreements That Substantially Modify the United States' Obligations Under an Existing Treaty*, 20 Op. O.L.C. 389, 391–92 (1996) ("*Validity of Agreements*"). But again, section 1234(a) does not purport to alter the domestic effect of the Open Skies Treaty; rather, it seeks to regulate the actions of the Executive Branch on the international plane.[9]

Finally, section 1234(a) is not a reasonable condition imposed upon the President's diplomatic relations in exchange for Congress's offer to expedite consideration of its approval of the resulting agreement. In the context of so-called "fast-track" trade agreements, we have recognized that Congress may agree "to consider legislation implementing an agreement on an expedited basis only on the condition that the President comply with certain requirements that are otherwise constitutional." *Trade Act Restrictions on the Extension of Most-Favored-Nation Rights*, 11 Op. O.L.C. 128, 128 n.1 (1987) ("*Trade Act Restrictions*"); *see also* Memorandum for L. Anthony Sutin, Acting Assistant Attorney General, Office of Legislative Affairs, from William Michael Treanor, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Trade and Tariff Act (S. 2400)* at 3 (Aug. 19, 1998) ("Congress may impose reasonable and relevant consultation and notification requirements" in exchange for granting "fast-track treatment to trade agreements"). In such cases, Con-

---

[9] Similarly, section 1234(a) cannot be justified as an exercise of Congress's power to authorize the President in advance to pursue negotiations that modify an international agreement. *See Validity of Agreements*, 20 Op. O.L.C. at 395–401.

gress does not prohibit the President from exercising his diplomatic authorities, but simply offers him expedited legislative consideration of domestic legislation to implement a trade agreement in return for meeting reasonable conditions negotiating the agreement in the first place.[10] The President always retains his "independent authority" to bypass those congressional requirements in negotiating an agreement, at the price of foregoing fast-track procedures. *Trade Act Restrictions*, 11 Op. O.L.C. at 128 n.1. In marked contrast, however, section 1234(a) does not offer the President any choice or advantage, but is an attempt to delay the United States' submission of its notice of withdrawal.

In sum, section 1234(a) invades the exclusive authority of the President. Article XV provides that the United States may withdraw unilaterally on six months' notice, *see* OST art. XV, ¶ 2, but section 1234(a) provides for a delay in withdrawing until ten months after the President makes the withdrawal decision, and only following advance consultation with the other state parties, *see* FY 2020 NDAA § 1234(a), 133 Stat. at 168. Congress therefore has sought to burden the President's discretion to execute the Treaty according to its terms. Congress "may not constitutionally 'dictate the modes and means by which the President engages in international diplomacy.'" *Engagement of OSTP with China*, 35 Op. O.L.C. 122 (quoting *Delegations to U.N. Agencies*, 33 Op. O.L.C. at 226); *see also PLO's Diplomatic Activities* at 7 (recognizing that Congress may not contravene "the exclusive authority to conduct diplomacy on behalf of the United States"). If Congress cannot determine the "modes" or "means" of the President's diplomacy, it may not compel, restrict, or delay the President's diplomatic conduct in the first instance, including in questions of timing, and especially when that conduct involves the exercise of a right provided for under a treaty. Worse yet, one of these conditions (consulting with the state parties) is itself a diplomatic activity that lies within the discretion of the President. By enacting section 1234(a), Congress injected itself into the decision whether and when to terminate a

---

[10] Even where the President is offered a choice, there are cases where such conditions may be unconstitutional. *See, e.g.*, *Publication of a Report to the President on the Effect of Automobile and Automobile-Part Imports on the National Security*, 44 Op. O.L.C. __, at *20 (Jan. 17, 2020); *Section 609 of the FY 1996 Omnibus Appropriations Act*, 20 Op. O.L.C. 189, 196–98 (1996). But reasonable conditions on otherwise appropriate domestic legislation do not unconstitutionally interfere with the powers of the President.

treaty, thereby interfering with the President's ability to take the sort of "decisive," *Zivotofsky*, 576 U.S. at 15, or "immediate action," *Goldwater*, 617 F.2d at 706, that the Constitution authorizes the President to undertake in the conduct of foreign affairs.

## IV.

Our conclusion is reinforced by the historical practice of the United States' withdrawal from treaties. *See, e.g.*, *NLRB v. Noel Canning*, 573 U.S. 513, 537 (2014). We have not identified any direct precedent for a law like section 1234(a). Although there are examples in which Congress claimed a role in the withdrawal of treaties over the centuries, the modern practice stands decidedly to the contrary, and even those earlier examples do not support the conclusion that Congress may require the United States to remain in a treaty longer than the President deems in the national interest.

## A.

Section 1234(a) appears almost unique in our Nation's history. Although Congress has claimed at times an authority to direct the President to exercise the country's right to withdraw from a treaty, we are not aware of prior instances where Congress has adopted a law purporting to prohibit or delay such a presidential decision. In recent cases, the Supreme Court has repeatedly looked askance at novel structures that seek to alter the separation of powers. *See Zivotofsky*, 576 U.S. at 23 (placing "'significant weight upon historical practice'" in concluding that the President had exclusive constitutional authority to recognize foreign governments (quoting *Noel Canning*, 573 U.S. at 514)); *see also Seila Law*, 140 S. Ct. at 2201 ("'Perhaps the most telling indication of [a] severe constitutional problem' with an executive entity 'is [a] lack of historical precedent' to support it." (quoting *Free Enterprise Fund*, 561 U.S. at 505)). As in those cases, the absence of any precedent for a restriction like section 1234(a) speaks loudly.

We have identified two modern instances where Members of Congress proposed measures to restrict the President from withdrawing from a treaty. In both cases, this Office objected on constitutional grounds, and the measures were not adopted. In 1979, the Office reviewed a Senate

proposal that would have conditioned its approval of an agreement arising out the Strategic Arms Limitations Talks ("SALT") on a reservation that the President could exercise the right to terminate the treaty "only with the approval of the Senate." Memorandum for Cyrus Vance, Secretary of State, from John M. Harmon, Assistant Attorney General, Office of Legal Counsel, *Re: Proposed Reservation to SALT II Conditioning Termination on Senate Approval* at 1 (Nov. 13, 1979). Article XIX of the agreement permitted termination if the United States determined that "extraordinary events related to the subject matter of [the treaty] have jeopardized its supreme interests." *Id.* We viewed the Senate's proposal to be unconstitutional because determining whether "extraordinary events" had "jeopardized" the country's interests was a determination to be made exclusively by the President. *See id.* at 2. Any attempt to impose such a limit "by the Senate through a reservation to the treaty, or through a Senate resolution, or even through *legislation passed by both Houses of Congress* to require Senate approval as a condition to the exercise of that presidential authority would be unconstitutional." *Id.* (emphasis added). The Senate did not adopt the proposal (or ultimately approve the agreement).[11]

In 1988, the Office raised a similar objection in reviewing a bill entitled the Anti-Terrorism Sanctions Act of 1988, which would have required the President to "terminate, withdraw, or suspend any portion of any trade agreement or treaty" with certain countries found to support international terrorism. 134 Cong. Rec. 4334 (1988). The bill would have allowed the President to "waive all, or any portion of" its provisions if such a waiver were in the best interests of the United States. *Id.* Any waiver, however, would have become effective "only after the close of the thirty-day period

---

[11] The Senate's draft resolution of ratification did not include the requirement for Senate approval. *See The SALT II Treaty*, S. Exec. Rep. No. 96-14, at 72–78 (1979). As late as November 15, 1979, some members of the Senate still urged its inclusion, but agreed to postpone resolution of the issue until the D.C. Circuit rendered its decision in the then-pending *Goldwater* litigation. *See* 125 Cong. Rec. 32,525 (1979) (statement of Sen. Goldwater). The D.C. Circuit issued its decision on November 30, 1979, *see Goldwater*, 617 F.2d at 697, but subsequent events obviated further discussion after the Soviet Union invaded Afghanistan and President Carter requested the Senate postpone consideration of SALT II, *see Letter to the Majority Leader of the Senate Requesting a Delay in Senate Consideration of the Treaty* (Jan. 3, 1980), 1 Pub. Papers of Pres. Jimmy Carter 12 (1980). Ultimately, the SALT II treaty was never ratified. *See, e.g.*, 132 Cong. Rec. 3500 (1986).

[beginning] on the date on which the President submits to the Congress written notice of such waiver." *Id.* Again, the Office found this bill to be "unconstitutional because it require[d] the President to terminate treaties or executive agreements." Memorandum for Thomas M. Boyd, Acting Assistant Attorney General, Office of Legislative Affairs, from John O. McGinnis, Deputy Assistant Attorney General, Office of Legal Counsel, att. at 1 (June 16, 1988) (attaching draft Letter for Lloyd Bentsen, Chairman, Committee on Finance, U.S. Senate, from Thomas M. Boyd, Acting Assistant Attorney General, Office of Legislative Affairs). Moreover, the bill was "not saved from unconstitutionality by the waiver provision." *Id.* at 2. We explained that, "[s]ince the power to terminate treaties and other international agreements is vested exclusively in the President, Congress does not have the constitutional power to condition his exercise of that power in any way." *Id*. Again, that bill was not enacted.[12]

---

[12] Although section 1234(a) is novel on the subject of treaty withdrawal, it bears similarities to other statutory provisions that require congressional notification before the exercise of certain executive actions. Where these notification provisions burden areas within the exclusive constitutional authority of the President, the Executive Branch has raised similar constitutional objections. *See, e.g.*, *Constitutionality of Proposed Statutory Provision Requiring Prior Congressional Notification for Certain CIA Covert Actions*, 13 Op. O.L.C. 258, 258–61 (1989) (objecting to a notice provision that would prohibit the expenditure of certain funds for covert activities "if the President [had] not first notified the appropriate congressional committees of the proposed expenditure" because it would "requir[e] the President to relinquish his constitutional discretion in foreign affairs"); *Inspector General Legislation*, 1 Op. O.L.C. 16, 18 (1977) (concluding that a requirement that the President notify Congress before removing an inspector general "constitute[d] an improper restriction on the President's exclusive power to remove Presidentially appointed executive officers"); *see also Statement on Signing the Intelligence Authorization Act, Fiscal Year 1990* (Nov. 30, 1989), 2 Pub. Papers of Pres. George Bush 1609, 1610 (1989) (objecting to a similar provision because "its obvious effect is to burden [the] exercise" of the President's removal authority, and therefore, "while I intend to communicate my reasons in the event I remove an Inspector General, I shall do so as a matter of comity rather than statutory obligation.").

## B.

Although section 1234(a) appears to be unique among statutes in restricting the President's authority over treaty withdrawal, the historical practice proves more equivocal when it comes to determining what role Congress may play in the termination of treaties. As early as the Washington Administration, the Founders divided over the responsibility for treaty termination, and there are examples before the Civil War where Congress and the Senate played a role in the process. *See NAFTA Withdrawal* at *7–10. "Although the President's authority to act unilaterally to terminate a treaty is now well established, there are a number of early examples involving alternative procedures for treaty termination, including 'direct congressional action, congressional authorization or direction of presidential action, and senatorial authorization or approval." *Id.* at *7 (quoting Restatement (Fourth) § 113 cmt. c). These early examples include one instance where Congress purported to abrogate a treaty directly and a handful of others where Congress or the Senate affirmatively requested or directed that the President terminate a treaty or other international agreement. In some cases, the President agreed to take such measures, but in others, he raised constitutional objections and declined to do so.

By the end of the nineteenth century, however, the practice turned more strongly in the President's favor. "Beginning with President McKinley in 1899, and growing over time, Presidents increasingly assumed the authority to terminate a treaty without approval by the Senate or the full Congress." *NAFTA Withdrawal* at *11. In our prior opinion, we discussed numerous examples of treaty terminations, *id.* at *11–12, and cited several other cases where Presidents had unilaterally terminated other kinds of international agreements, *id.* at 15–18.[13] These examples reinforce that the President's authority under the Constitution to exercise the right of the

---

[13] Additional examples reinforce the trend towards unilateral presidential termination. *See* 5 Green Haywood Hackworth, *Digest of International Law* § 509, at 329–32 (1943) ("Hackworth") (discussing the termination of an anti-smuggling convention with Mexico in 1927 "without the direction of either the Senate alone or both Houses of Congress;" the U.S. withdrawal from a commercial convention in 1933 "without action by the Senate or both Houses of Congress;" and the unilateral termination of an agreement with Japan by President Roosevelt in 1939).

United States to terminate a treaty arises as an incident to the President's authority over the execution of treaties and diplomacy.

The historical practice may not be uniform, but we think that the most salient lesson arises from what the history does not contain. Although Presidents from time to time have acted consistently with congressional requests to terminate treaties, we are not aware of any instance in which a treaty has been allowed to endure based upon congressional action contrary to the President's wishes. *See Goldwater*, 617 F.2d at 706. Section 1234(a), however, purports to have this exact effect by requiring the country to remain a party to the Treaty for at least four months longer than the President has otherwise determined to be appropriate. And like the *Goldwater* court, we find the absence of any historical analogue to be telling evidence that section 1234(a) unconstitutionally restricts the President. *Cf. Zivotofsky*, 576 U.S. at 23.

### 1.

As we explained in the *NAFTA Withdrawal* opinion, "[w]hile it would have been convenient had the Founders squarely addressed treaty termination in the constitutional text itself, we are left with no such clarity, and the appropriate division of authority between the President and Congress was hotly debated at the very start of the Republic." *Id.* at *7. In 1793, President Washington proclaimed United States neutrality in revolutionary France's conflict with Great Britain and other European powers. *See* Neutrality Proclamation (Apr. 22, 1793), 1 *A Compilation of the Messages and Papers of the Presidents, 1789–1897*, at 156–57 (James D. Richardson ed., 1896) ("*Papers of the Presidents*"). The Neutrality Proclamation raised a question about whether neutrality was consistent with the United States' treaties of alliance and amity with France, which had been adopted during the Revolutionary War, and obligated the United States, among many other things, to guarantee the security of French possessions in the West Indies. *See* Treaty of Alliance, U.S.-Fr., Feb. 6, 1778, 8 Stat. 6; *see also* Treaty of Amity and Commerce, U.S.-Fr., Feb. 6, 1778, 8 Stat. 12.

Following the Neutrality Proclamation, Washington's cabinet debated whether the United States should formally suspend or terminate those treaties. Secretary of the Treasury Alexander Hamilton and Secretary of War Henry Knox argued that suspension or termination was permissible

22

under international law, but Secretary of State Thomas Jefferson and Attorney General Edmund Randolph disagreed.[14] None of the cabinet officers, however, seems to have questioned that the President could suspend or terminate the treaties himself, if it were appropriate. To the contrary, in publicly defending the Neutrality Proclamation, Hamilton opined that, "though treaties can only be made by the President and Senate, their activity may be continued or suspended *by the President alone*." Alexander Hamilton, *Pacificus* No. 1 (June 29, 1793), *reprinted in* 15 *The Papers of Alexander Hamilton* 33, 42 (Harold C. Syrett ed., 1969).[15]

President Washington took a similarly broad view of the President's authority in this area during a 1796 dispute with the House of Representatives over whether that body could request a copy of the President's diplomatic instructions to his emissary, Chief Justice John Jay. Message to the House of Representatives (Mar. 30, 1796), 1 *Papers of the Presidents* 194. President Washington explained that the House could not constitutionally demand those papers because it lacked any legitimate legislative purpose, since "the power of making treaties is exclusively vested in the President, by and with the advice and consent of the Senate, provided two-thirds of the Senators present concur; and that every treaty so made and promulgated thenceforward became the law of the land." *Id.*

---

[14] *Compare* Letter for George Washington from Alexander Hamilton and Henry Knox (May 2, 1793), 14 *The Papers of Alexander Hamilton* 367, 372–85 (Harold C. Syrett ed., 1969), *with* Thomas Jefferson, Opinion on the Treaties with France (Apr. 28, 1793), 25 *The Papers of Thomas Jefferson* 608, 609–17 (John Catanzariti ed., 1992), *and* Letter for George Washington from Edmund Randolph (May 6, 1793), 12 *The Papers of George Washington* 534, 537–43 (Christine Sternberg Patrick & John C. Pinheiro eds., 2005).

[15] James Madison, who was then in the House of Representatives, disagreed, arguing that the treaty power was "legislative" not "executive" in character and that the President's neutrality proclamation had usurped Congress's power to declare war. *See* James Madison, *Helvidius* No. 1 (Aug. 24, 1793), *reprinted in* 15 *The Papers of James Madison* 66, 69 (Thomas A. Mason et al. eds., 19851985). In 1801, Jefferson took a similar view in his Manual of Parliamentary Practice. *See* Thomas Jefferson, *A Manual of Parliamentary Practice* § 599 (Samuel Harrison Smith ed., 1801) (citing the 1798 example, but no other authority, for the proposition that, "[t]reaties being declared, equally with the laws of the U. States, to be the supreme law of the land, it is understood that an act of the legislature alone can declare them infringed and rescinded"); *see also Ware v. Hylton*, 3 U.S. (3 Dall.) 199, 261 (1796) (Iredell, Circuit Justice) (declaring that "Congress . . . alone" had the power to "void" a treaty based on a breach by another party to the treaty, which would require the circuit justice to "forbear any share in executing it as a judge").

at 195. President Washington's message reflected the view that the House did not have any ongoing role in the implementation or the termination of the Jay Treaty.

Although these examples reflect an understanding that the Executive alone is responsible for the maintenance of treaties, Congress during the Adams Administration took a step in the other direction when it adopted a measure to abrogate the treaties with France—the only case where Congress acted to directly abrogate a treaty, rather than to request that the President himself take such an action. In 1798, as relations with France deteriorated following the XYZ Affair, Congress enacted a series of measures to authorize the Quasi-War with France, one of which included a declaration that "the treaties concluded between the United States and France," including the treaty of alliance, "shall not henceforth be regarded as legally obligatory on the government or citizens of the United States." Act of July 7, 1798, ch. 67, 1 Stat. 578, 578. There was some debate within Congress about whether that step fell within Congress's power. *See* David P. Currie, *The Constitution in Congress: The Federalist Period, 1789–1801*, at 251–52 (1997). President Adams, however, implemented the joint resolution after signing it into law. *See* Proclamation Revoking the Exequaturs of the French Consuls (July 13, 1798), 9 *The Works of John Adams, Second President of the United States* 170, 171–72 (1854).

At the time, and in the years since, there has been disagreement about whether the 1798 Act actually terminated the treaties with France or merely abrogated their *domestic* legal effects. *See NAFTA Withdrawal* at *8–9 & n.5. President Adams apparently did not submit any notice of withdrawal from the treaties.[16] And French representatives took the position in later negotiations that the legislative act had not effectively re-

---

[16] *See* Memorandum for the Senate Committee on Foreign Relations, from Vita Bite, Congressional Research Service, *Re: Precedents for U.S. Abrogation of Treaties* (Feb. 25, 1974) ("*Abrogation Precedents*"), *reprinted in* S. Comm. on Foreign Relations, 95th Cong., *Treaties and Other International Agreements: The Role of the United States Senate* 44, 54 (Comm. Print 1978) ("*Treaties Report*") ("[I]t does not appear that [President Adams] took any steps to give France notice that the treaties had been denounced by the United States."); David Gray Adler, *The Constitution and the Termination of Treaties* 152–59 (1986) (arguing that the 1798 statute did not validly terminate the international-law obligations of the United States under the treaty because President Adams did not provide notice).

leased the United States from its international obligations. *See* 5 John Bassett Moore, *A Digest of International Law* § 774, at 357–58 (1906); 5 John Bassett Moore, *History and Digest of the International Arbitrations to Which the United States Has Been a Party* 4430–31 (1898). Later authors similarly opined that the 1798 Act had only domestic effect. *See* Samuel B. Crandall, *Treaties: Their Making and Enforcement* § 185, at 463 (2d ed. 1916) ("Crandall") ("An abrogation by Congress . . . while necessarily binding on the courts of this country, and sufficient to terminate the operation of the treaty as municipal law, will seldom be accepted by the other contracting parties as conclusive."); 2 Francis Wharton, *A Digest of International Law* § 137a, at 60 (1886) ("This annulling act . . . whatever might be its municipal effect, by itself could not internationally release the United States from its obligations to France."). *But see Hooper v. United States*, 22 Ct. Cl. 408, 425–26 (1887) (concluding the opposite).

To the extent that the 1798 Act did abrogate the treaties of alliance and amity themselves, it might perhaps be viewed as a necessary incident to Congress's decision to authorize the Quasi-War with France, which fell within Congress's enumerated power to "declare War." *See NAFTA Withdrawal* at \*8–9; *see also Jones v. Walker*, 13 F. Cas. 1059, 1062 (C.C.D. Va. 1793) (No. 7507) (Jay, Circuit Justice) (stating that the decision about whether a treaty of peace should be voided is committed "to congress" because it is "necessarily incident to the right of making war"); Letter for Edmund Pendleton from James Madison (Jan. 2, 1791), 13 *The Papers of James Madison* 342, 344 (Charles F. Hobson and Robert A. Rutland eds., 1981) (raising "a question" about whether "in case the President & Senate be competent in ordinary Treaties, the Legislative authority be requisite to annul a *Treaty of peace*, as being equipollent to a Declaration of war, to which that authority alone, by our Constitution, is competent"); William Rawle, *A View of the Constitution of the United States of America* 68 (Philip H. Nicklin ed., 2d ed. 1829) ("Congress alone possesses the right to declare war; and the right to qualify, alter, or annul a treaty being of a tendency to produce war, is an incident to the right of declaring war."). The 1798 example thus might present a distinct question from whether Congress may otherwise regulate the President's authority to execute the withdrawal provision of a treaty.

Whatever the correct understanding of the 1798 Act, Congress has never taken the same action again, and that action occurred during an era in which the division of authority between Congress and the President on this issue was still "hotly debated." *NAFTA Withdrawal* at \*7. The Nation's early historical practice thus does not yield a clear or consistent understanding of the relative powers of Congress and the President. *See id.* at \*7–\*9.

## 2.

Apart from the 1798 Act, there are several other instances where Congress adopted a law that purported to direct the President to take steps to withdraw from a treaty. In two cases, the President acted consistently with the laws; in other instances, he demurred.

In 1883, Congress directed President Arthur to terminate portions of an 1871 treaty with Great Britain. J. Res. No. 22 of Mar. 3, 1883, § 2, 22 Stat. 641, 641 (resolving that "the President be and he hereby is, directed to give and communicate to the Government of Her Brita[n]nic Majesty such notice of such termination" of articles 18 through 25 of the treaty). President Arthur's Administration delivered the notice, apparently without objection. Letter for J.R. Lowell, Minister to the U.K., from Frederick T. Frelinghuysen, Secretary of State (Apr. 5, 1883), Office of the Historian, U.S. Dep't of State, *Papers Relating to the Foreign Relations of the United States*, https://history.state.gov/historicaldocuments/frus1883/d222. Similarly, in 1915, Congress enacted a statute providing that certain "articles in treaties and conventions" were "in conflict with the provisions" of the Seaman's Act, and accordingly that "the President be, and he is hereby, requested and directed . . . to give notice . . . that . . . all such treaties and conventions between the United States and foreign Governments will terminate." Seaman's Act, ch. 153, § 16, 38 Stat. 1164, 1184 (1915). President Wilson acted consistently with Congress's direction. *See* Crandall § 184, at 460; *see also* 5 Hackworth § 508, at 309–12 (reprinting diplomatic correspondence on the matter).

In other instances, however, Presidents have raised constitutional objections to such congressional directives. In 1879, President Hayes vetoed a bill that purported to direct him to terminate two articles of the 1868 Burlingame Treaty with China. 8 Cong. Rec. 2275 (1879) (reprinting the

President's message regarding the veto of "House bill No. 2423, entitled 'An act to restrict the immigration of Chinese to the United States'"). President Hayes objected that the bill amounted to a direction by Congress to "modify[] existing treaties," a power he believed "not lodged by the Constitution in Congress, but in the President, by and with the advice and consent of the Senate, as shown by the concurrence of two-thirds of that body." *Id.* at 2276.[17] Since President Hayes stated that "denunciation of a part of a treaty" would result in "denunciation of the whole treaty," he objected to a congressional directive that he thought would have required him to terminate the treaty in its entirety. *Id.*

Similarly, in 1920, President Wilson considered an act that directed the President to give notice that the provisions of treaties that impose "any . . . restriction on the United States [regarding certain tonnages and duties] will terminate on the expiration of such periods as may be required for the giving of such notice." Merchant Marine Act of 1920, ch. 250, § 34, 41 Stat. 988, 1007. President Wilson, citing the precedent set by President Hayes, refused to comply on the grounds that "the power of modifying an existing treaty, whether by adding or striking out provisions, is a part of the treaty-making power under the Constitution," and "its exercise is not competent for Congress." U.S. Dep't of State, Press Release (Sept. 24, 1920), *in* 5 Hackworth § 509, at 323–24.

In 1986, over President Reagan's veto, Congress enacted into law the Comprehensive Anti-Apartheid Act of 1986 ("CAAA"), which provided that "[t]he Secretary of State shall terminate" an air services agreement with South Africa. Pub. L. No. 99-440, § 306(b)(1), 100 Stat. 1086, 1100. The Secretary of State later did comply with the statute. *See S. African Airways v. Dole*, 817 F.2d 119, 121 (D.C. Cir. 1987). But at the same

---

[17] Citing the 1798 Act respecting the treaties with France, President Hayes also said that "[t]he authority of Congress to terminate a treaty with a foreign power by expressing the will of the nation no longer to adhere to it, is . . . free from controversy under our Constitution." 8 Cong. Rec. 2276 (1879). But in context, President Hayes appears to have been referring to Congress's authority to annul the domestic legal effects of a treaty. *See id.* (reprinting President Hayes's observation that "the ordinary legislation of Congress" may have domestic effects, but that such legislation has never "been regarded as an abrogation, even for the moment, of [a] treaty," and that, "[o]n the contrary, the treaty in such case still subsists between the Governments"); *see also* David Gray Adler, *The Constitution and the Termination of Treaties* 175–76 (1986) (discussing the incident).

time, this Office objected that it was "constitutionally impermissible" for Congress to purport to require the President "to abrogate . . . international treaties and agreements." Memorandum for the Attorney General from Douglas W. Kmiec, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Presidential Signing Statements* at 3 (Oct. 10, 1986). In addition, President Reagan vetoed the statute in part because it contained "provisions that infringe on the President's constitutional prerogative to articulate the foreign policy of the United States." *Message to the House of Representatives Returning Without Approval a Bill Concerning Apartheid in South Africa* (Sept. 26, 1986), 2 Pub. Papers of Pres. Ronald Reagan 1278, 1279 (1986).[18]

Taken together, we do not believe that these few cases in which Congress sought to direct treaty termination are sufficient to support the constitutionality of section 1234(a). The fact that Presidents in some instances acted consistently with congressional directives does not establish that the directives themselves were constitutionally permissible. *See, e.g.*, *Myers v. United States*, 272 U.S. 52, 170 (1926) (purported "general acquiescence by the Executive [to] the power of Congress" did not render congressional exercise of its power constitutional). This is especially so, given that the Executive Branch lodged contemporaneous objections to some of those restrictions. *See Seila Law*, 140 S. Ct. at 2201–02 (discounting the relevance of historical precedents for a constitutionally questionable arrangement to which the Executive Branch had mounted constitutional objections). The few examples where the President complied with the directives may further indicate nothing more than that the President agreed with those measures as a matter of policy. Moreover, whatever the value of these examples, the precedents set by President Hayes, President Wilson, and President Reagan reflect a contrary and

---

[18] Some Members of Congress also acknowledged that the CAAA improperly infringed on the President's exclusive authorities in foreign affairs. *See* 132 Cong. Rec. 27,665 (1986) (statement of Sen. Hatch) ("[W]e ought to go with the President. I think we ought to let him conduct foreign policy. I do not think we, in our zeal to act like civil rights reformers in America, should intervene with that type of foreign policy."); *id.* at 27,671 (statement of Sen. Helms) (stating that the President "deserves to be given a chance to do his constitutional duty—that is, to conduct the foreign policy of this country," and that overriding the veto of the CAAA would "den[y]" him the chance to do so).

long-standing view that Congress lacks the authority to require the President to terminate a treaty.

### 3.

There are also a number of occasions where Congress and the President acted together to terminate a treaty. In 1846, Congress authorized President Polk, at his request, to submit a notice of termination from a treaty with Great Britain "at his discretion." J. Res. No. 4 of Apr. 27, 1846, 9 Stat. 109, 109–10; Crandall § 184, at 458.[19] President Polk's Administration delivered the notice. *See* Crandall § 184, at 459; *see also Notice for the Joint Occupancy of Oregon to Terminate*, 71 Niles' Nat'l Reg. 17, 17 (1846). Although President Polk's Secretary of State explained to the U.S. ambassador to Great Britain that "Congress [has] spoken their will upon the subject in their joint resolution, and to this it is [the President's] and your duty to conform," S. Doc. No. 29-489, at 15 (1846), the resolution expressly left the matter to the President's discretion.

In another case, in 1854, President Pierce announced his desire to terminate a Navigation Treaty with Denmark, and the Senate adopted a resolution authorizing that step. *Abrogation Precedents* at 55. As with President Polk, some legislators questioned whether congressional involvement was necessary. Memorandum for the Secretary of State from Herbert J. Hansel, Legal Adviser, U.S. Dep't of State, *Re: President's Power to Give Notice of Termination of U.S.-ROC Mutual Defense Treaty* (Dec. 15, 1978), *reprinted in Treaties Report* at 395, 404. In 1864, President Lincoln, without first seeking congressional authorization, gave notice that the United States was withdrawing from a treaty concerning armaments on the Great Lakes. After he did so, Congress, via joint resolution, "ratif[ied]" the President's action, although President Lincoln, without further congressional involvement, revoked the notice of withdrawal. *See NAFTA Withdrawal* at *10–11.

In 1865, Congress authorized the President to terminate the 1854 Reciprocity Treaty with Great Britain, which President Johnson subsequently did. J. Res. No. 6 of Jan. 18, 1865, 13 Stat. 566; *see also* 67 Cong.

---

[19] Three members of the House took the position that the House had no constitutional authority to authorize the President to terminate this treaty. *See* H.R. Rep. No. 29-34, at 1–3 (1846).

Rec. 10,424 (1926) (describing the termination of the treaty after trans-
mission of notice by the United States). Later, when a controversy arose
with Great Britain about the construction of an article in an 1842 treaty,
President Grant deferred to Congress on the question of whether the
article should be terminated, saying that it was "for the wisdom of
Congress to determine whether the Article . . . is to be any longer re-
garded as obligatory on the government of the United States or as form-
ing part of the Supreme Law of the Land," and that he would take no
action without "an expression of the wish of Congress."[20] President
Grant nonetheless suspended the operation of the treaty without obtain-
ing congressional approval for six months before the dispute was finally
resolved through a subsequent agreement with Great Britain. *See* Mes-
sage to Congress (Dec. 23, 1876), 28 *The Papers of Ulysses S. Grant*
100 (John Y. Simon ed., 2005); Crandall § 185, at 464.

Similarly, in 1911, President Taft gave notice to Russia of his intent to
terminate a commercial treaty according to its terms, and then submitted a
resolution for "ratification and approval" of his action to the Senate. 48
Cong. Rec. 453 (1911). Congress enacted a joint resolution that "adopted
and ratified" the President's action. Pub. Res. No. 62-13, 37 Stat. 627
(1911); Curtis A. Bradley, *Treaty Termination and Historical Gloss*, 92
Tex. L. Rev. 773, 795 (2014).

These examples reflect episodes, nearly all in the nineteenth century,
where Presidents accepted or invited congressional involvement in treaty
termination. But they do not support an affirmative power of Congress to
regulate the President's action over his objection. We think that the clear-
est lesson from history is the one that bears most directly on the constitu-
tionality of section 1234(a): as the D.C. Circuit has observed, "in no
situation has a treaty been continued in force over the opposition of the
President." *Goldwater*, 617 F.2d at 706. Accordingly, these historical
instances of shared responsibility do not support the constitutionality of a
legislative measure that requires the President to act contrary to what is,
in his judgment, in the best interests of the United States regarding the
exercise of the United States' right to withdraw from a treaty.

---

[20] Message to Congress (June 20, 1876), *in* 27 *The Papers of Ulysses S. Grant* 147, 150
(John Y. Simon ed., 2005); *see also* Crandall § 185, at 463–64.

### V.

Section 1234(a) of the 2020 NDAA unconstitutionally interferes with the President's exclusive authority to execute treaties and to conduct diplomacy, a necessary incident of which is the authority to exercise the United States' right to withdraw from a treaty. We therefore advised that the provision could not constitutionally require the Executive Branch to defer providing notice of the intent to withdraw from the Open Skies Treaty.

STEVEN A. ENGEL
*Assistant Attorney General*
*Office of Legal Counsel*